IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH STANSELL,                                    CASE NO.: 15-cv-1519
MARC GONSALVES,
THOMAS HOWES,
JUDITH JANIS,
CHRISTOPHER JANIS,
MICHAEL JANIS,
GREER JANIS, and
JONATHAN JANIS,

        Plaintiffs,
vs.

REPUBLIC OF CUBA,

        Defendant.
_____/

## COMPLAINT

Plaintiffs sue Defendant and allege:

## THE ACTION,  JURISDICTION & VENUE

1.      This is a civil action for damages arising from Defendant providing over four decades of

material support and resources to the designated Foreign Terrorist Organization ("FTO")

REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC")  and its members in support

of international terrorism.  Defendant support led to a series of acts of international terrorism

perpetrated by the FARC on Plaintiffs commencing on February 13, 2003 when Plaintiffs' aircraft

was shot down in Colombia.  Plaintiffs were U.S. national civilians flying a civilian FAA registered

aircraft conducting a contract DOD counter narcotics surveillance flight at the time their aircraft was

shot down.  After a successful crash landing, the pilot, THOMAS JANIS, was shot and killed by the

FARC.  The FARC imprisoned KEITH STANSELL, MARC GONSALVES and THOMAS

HOWES and held them hostage and tortured them in the Colombian and Venezuelan jungle for over 5 years until July 2, 2008 (1,967 days total captivity).

2.      This action is brought pursuant to the Foreign Sovereign Immunities Act's terrorism exception to the jurisdictional immunity of a foreign state, 28 U.S.C. §1605A.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1605A(a) and (c) because Plaintiffs are all U.S. nationals, and were civilians performing a counter-narcotics contract awarded by the U.S. government, and were subjected to acts of international terrorism, including torture, extrajudicial killing, hostage taking, and Cuba's provision of material support or resources contributed to causing these acts of international terrorism, while Cuba was designated as a state sponsor of terrorism, and was so designated within the 6-month period before this action was filed.

4.      Venue is proper in this district because of the substantial loss of solatium, mental anguish, bereavement, grief, loss of spousal and parental society, comfort and guidance, occurred and were sustained in this district by the survivors of TOM JANIS, deceased, and these damages give rise to this claim.  28 U.S.C. §1391(f)(1).

5.      This action is timely filed within 10 years of when the cause of action accrued upon the hostages rescue from their FARC captors, and the ensuing confirmation by the Janis family that it was in fact the FARC who had murdered Tom Janis.  28 U.S.C. §1605A(b).

**THE PLAINTIFFS**

6.      Plaintiff KEITH STANSELL is a U.S. citizen residing in Florida.   Keith Stansell is a former United States Marine and was the mission commander for the February 13, 2003 counter narcotics flight.

2

7.      Plaintiff MARC GONSALVES is a U.S. citizen residing in Florida. Marc Gonsalves is an electronic surveillance systems specialist and was the chief counter narcotics analyst and collection officer on the February 13, 2003 flight.

8.      Plaintiff THOMAS HOWES is a U.S. citizen residing in Florida. Thomas Howes is a highly experienced pilot and was the second in command pilot on the February 13, 2003 flight.

9.      THOMAS JANIS was a citizen of the United States residing in Montgomery County, Alabama at the time the FARC murdered him on February 13, 2003.  THOMAS JANIS was the pilot in command of the February 13, 2003 flight.  THOMAS JANIS was a retired U.S. Army aviator and member of the U.S. Army's Special Operations Unit - Delta Force, who retired from the U.S. military after 32 years, and was the recipient of the Bronze Star and the Air Medal with Combat Distinguishing Device for Valor.

10.      Plaintiff, JUDITH JANIS, is a U.S. citizen and resident of Montgomery County, Alabama and is the surviving spouse of Thomas Janis.

11.      Plaintiff CHRISTOPHER  JANIS is a U.S. citizen and the surviving son of Thomas  Janis. Christopher Janis recently retired from active duty with the United States Army after serving multiple combat tours, and currently resides in this district in Dadeville, Tallapoosa County, Alabama.

12.      Plaintiff GREER JANIS is a U.S. citizen and the surviving daughter of Thomas Janis, and currently resides in Colorado.

13.      Plaintiff MICHAEL JANIS is a U.S. citizen and the surviving son of Thomas Janis. Michael Janis is currently on active duty with the United States Army serving a combat tour as an aviator in Afghanistan.

14.     Plaintiff, JONATHAN  JANIS is a U.S. citizen and the surviving son of Thomas  Janis, and currently resides in California.

## **DEFENDANT**

15.     The Republic of Cuba is a foreign state as defined in 28 U.S.C. §1603(a), and was a designated state sponsor of terrorism for approximately 33 years.  Cuba has been a Communist regime since its inception, and has a long history of exporting Communism and sponsoring terrorism throughout Latin America, Europe and Africa.

16.     The Republic of Cuba was first added to the U.S. Department of State list of states sponsoring international terrorism in 1982, pursuant to Section 6(j) of the Export Administration Act of 1979 (P.L. 96-72) based upon Cuba's ties to international terrorism and its support for terrorist groups in Latin America.

17.     The "state sponsors of terrorism list" is mandated under Section 6(j) of the Export Administration Act of 1979, as amended (P.L. 96-72; 50 U.S.C. app. 2405(j)), under which the Secretary of State makes a determination when a country "has repeatedly provided support for acts of international terrorism."

18.     At all times material hereto, from the FARC's murder of TOM JANIS on February 13, 2003, and throughout the 1,967 days that the Plaintiff hostages were tortured and held captive until their rescue on July 2, 2008, the Republic of Cuba remained a U.S. designated state sponsor of terrorism.

19.     The Republic of Cuba was not removed from the state sponsors of terrorism list until May 29, 2015, less than 6 months prior to the date this action was filed.

20.     In 1996, Congress made the following official findings concerning the Cuban government:

- The Cuban Government engages in the illegal international narcotics trade and harbors fugitives from justice in the United States;

- The Castro government threatens international peace and security by engaging in acts of armed subversion and terrorism such as the training and supplying of groups dedicated to international violence; and

- For the past 36 years, the Cuban Government has posed and continues to pose a national security threat to the United States.

Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. §§6021-6091, Section 2, Findings.

21.     Cuba had fair warning and knew that its support of anti-American terrorist groups like the FARC could subject Cuba to the jurisdiction of the U.S. for civil liability.

22.     Cuba's decision to purposefully provide material support and resources to anti-American FTOs, like the FARC, and the fact that the Plaintiffs' injuries, captivity and death arose out of terrorist activities, enabled Cuba to "reasonably anticipate being haled into" a U.S. court.

23.     Cuba has purposefully directed support to the FTO FARC that targeted U.S. citizens and is therefore subject to the personal jurisdiction of this Court compatible with the notions of fair play and substantial justice.

## FARC's PURPOSEFUL DIRECTION OF TERROR & ACTIVITIES
## AT CITIZENS OF THE UNITED STATES

24.     In 1964, the FARC were established as the military wing of the Colombian Communist Party.

25.     On October 8, 1997 the Secretary of State of the United States, designated the FARC designated foreign terrorist organization (FTO), pursuant to Title 8, United States Code, Section 1189.  The FARC was re-designated on September 5, 2001.  At all times material to this action, the FARC is a designated foreign terrorist organization.  Specifically, 8 U.S.C. § 1189(a)(1) authorizes

5

the Secretary of State to designate an organization as a foreign terrorist organization . . . if the

Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in

terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the

security of United States nationals or the national security of the United States. 8 U.S.C. §

1189(a)(1).

26.     The FARC is also a Specially Designated Global Terrorist ("SDGT") under IEEPA

Executive Order 13224.

27.     The FARC are terrorists who engage in international terrorism, including premeditated,

politically motivated violence, threats of violence, hostage takings, murders and other terrorist

related activities perpetrated against noncombatant targets including U.S. nationals.  The FARC

directs terrorist activities across national and international borders in order to influence U.S. and

Colombian policy.

28.     The FARC conspired to shoot down a U.S. aircraft, kidnap U.S. citizens, or kill them, and

to then hold them captive and broadcast their photographs worldwide for the express purpose of

inflicting terror on U.S. citizens and attempting to influence U.S. and Colombian government

policy.

29.     The FARC are strongly anti-American, have specifically targeted American citizens, and

have engaged in violent acts against Americans and Colombians.

30.     The FARC issued public statements in English and Spanish conveying anti-American

views, marking Americans as targets, and condemning the policies of the United States.

31.     On February 13, 2003 plaintiffs were conducting a counter narcotics surveillance mission

in a U.S FAA registered aircraft when the FARC opened fire on the aircraft.  Post-crash

investigation revealed the FARC had hit the aircraft with heavy machine gun fire before it had crash landed.

32.     FARC members have admitted that the FARC had intentionally fired at the aircraft to shoot it down, and capture its crew, knowing that it was a U.S. aircraft and U.S. national crew on-board.

33.     All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located the downed plane.   The American pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members within minutes of the landing, and their bodies were left a short distance from the crashed plane. The other three American hostages, Keith Stansell, Marc Gonsalves, and Thomas Howes were seized by force, taken hostage, and marched into the jungle by FARC members, where they were held captive for 1,967 days until their rescue July 2, 2008.

34.     The decedent, Thomas Janis was a retired United States Army Special Operations pilot, having served his last tour of duty before retirement as a Chief Warrant Officer Five member and Commander of Fixed Wing elements for a Special Forces Operational Detachment.  Following his 1998 military retirement, Thomas Janis was employed as a civilian flying reconnaissance and surveillance missions in Colombia in support of the global war against terrorism and narcotics trafficking.

35.     About two months after the plane crash, on April 27, 2003, the FARC issued a public communique taking credit for seizing and holding the three Americans hostages.   In that public letter, published to the United States, the FARC offered to release approximately 250 high level Colombian citizens that it was then holding hostage, together with the three Americans captured on February 13, 2003, in exchange for certain political concessions from the Colombian

government and to illegally influence the policy of the U.S. The FARC demanded that the Colombian government carve out of its sovereign territory a demilitarized zone (DMZ), which would be used as a new base of operations for the FARC, and release hundreds of FARC terrorists currently held by the Colombian authorities, as a condition for the release of the three American hostages.

36.     In July 2003, the FARC forced the Plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes to participate in a videotaped interview to prove that they were alive and being held by the FARC. A FARC senior leader Mono Jojoy, told the plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes that the FARC Commander "has ordered us . . . to send a proof of life to your families." The Plaintiffs' families lived inside the United States. The "proof of life" was delivered to CBS News, an American media organization in New York and aired throughout the U.S.

37.     The FARC demanded, in a form of communication published in the U.S., the release of two convicted FARC terrorists in the U.S. or the FARC would kill, injure, and continue to forcibly detain the plaintiffs.

38.     The FARC acts were intended to intimidate or coerce the Colombian and U.S. civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

39.     Cuba's provision of material support enabled the FARC to commit acts of international terrorism including the following acts of the FARC:

    a)   targeted American persons and companies;

    b)   engaged in 2 way radio communications to inform each other about the presence of the Plaintiffs' aircraft in the area of the FARC's Teofilo Forrero Mobile Column's area of operations;

c) obtained permission to attack the aircraft which the FARC knew carried U.S. nationals;

d) attacked the aircraft using firearms and seized as hostages U.S. nationals once the aircraft had crash landed;

e) shot and killed a U.S. national - pilot of the downed aircraft;

f) shot and killed a Colombian soldier who was part of the crew of the downed aircraft;

g) forced the plaintiffs away from the aircraft crash site using armed force and deadly force and took them hostage;

h) repeatedly transported the plaintiffs to remote areas away from the site of the hostage taking using armed force and deadly force, with their necks chained for long marches through dense jungle terrain;

i) detained the hostages under armed guard and threat of death at various locations in the jungle;

j) assigned specific FARC members to execute plaintiffs in the event a rescue attempt was committed;

k) performed sadistic jungle medical procedures on plaintiffs when they were injured;

l) starved the plaintiffs for long periods;

m) chained the plaintiffs with truck chains;

n) demanded that the Colombian government create a demilitarized zone and conduct an exchange of prisoners with the FARC as explicit conditions for the release of the plaintiffs/hostages;

o) prepared and published forced proof of life videos which were aired in the United States;

p) named senior commanders, with expertise in negotiations to represent the FARC in negotiations with the Colombian government for the release of U.S. plaintiffs/hostages held by the FARC;

q) obtained false and fraudulent identification documents to facilitate participation in the negotiations of FARC demands for release of the U.S. plaintiffs/hostages;

r) concealed the location of the plaintiffs/hostages;

s) subjected the plaintiffs/hostages to cruel and inhumane conditions resulting in

disease, illness, mental and physical injury and trauma;

t)  denied the plaintiffs/hostages adequate food and medical care;

u)  solicited and received material support from various persons and foreign companies doing business in Colombia, and other countries outside of Colombia, including payment of protection money, and supplies, transportation, logistics, medical care and treatment for FARC terrorists;

v)  solicited and received financial support from various foreign banks and non-bank financial institutions, money launderers, money changers, foreign citizens and persons of interest, non-governmental groups and charities, front companies including money laundering of proceeds of the FARC's criminal activities, and other banking and financial transaction services to support the FARC's ongoing hostage taking, captivity and narcotics trafficking activities;

w)  availed itself of the U.S. banking system through foreign banks, non-bank financial institutions, money changers and launderers, U.S. and foreign persons with foreign accounts or privileges to use clearing accounts to send, direct, divert, and disguise, financial support for terrorist activities, murder, hostage taking, support of hostages in captivity and the terrorist who guard the hostages, operate communications and shadow local governments, and establish logistics and supply lines for illegal activities, including narcotics trafficking.

## CUBA'S HISTORY OF MATERIAL SUPPORT AND RESOURCES TO TERRORISTS INCLUDING THE FARC

40.     28 U.S.C. §1605(h)(3) states that ""material support or resources" has the meaning given

that term in section 2339A of title 18, which further states:

> (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials

18 U.S.C. §2339A(b)(1).

41.     The United States government has made official annual factual findings on Cuba's support

of international terrorism, including those made in annual reports prepared by the United States

Central Intelligence Agency's National Foreign Assessment Center, the Department of State's

"Patterns in Global Terrorism", and its "Country Reports on Terrorism" these factual findings are

final agency action and are entitled to a greater degree of deference from the Court than under the

Chevron standard.

42.     The U.S. government's factual findings with respect to sponsorship of terrorism generally,

and Cuba's support of international terrorism up to and including the time of Plaintiffs' murder,

torture and captivity, include the following factual findings:

a)  In Latin America the USSR and Cuba appear to be pursuing a long-term coordinated campaign to establish sympathetic Latin American regimes. The Cubans clearly support organizations and groups in Latin America that use terrorism as a basic technique to undermine existing regimes.

b)  Havana openly supports and advocates armed revolution as the only means for leftist forces to gain power in Latin America. Cuba also supports organizations and groups in Latin America that use terrorism to undermine existing regimes. The Cubans have played an important role in facilitating the movement of men and weapons into Central and South America, providing direct support in the form of training, arms, safe havens, and advice to a wide variety of guerrilla groups.

c)  In its efforts to promote armed revolution by leftist forces in Latin America, Cuba supports organizations and groups that use terrorism to undermine existing regimes. In cooperation with the Soviets, the Cubans have facilitated the movement of people and weapons into Central and South America and have directly provided funding, training, arms, safehaven, and advice to a wide variety of guerrilla groups and individual terrorists.

d)  Manuel Pineiro Losada, head of the America Department of the Central Committee of the Communist Party, reaffirmed Cuban commitment to the revolutionary process - **including support for groups that use terrorism** - at the 1982 international theoretical conference. Pineiro stressed the fundamental Marxist-Leninist principle of the need "to destroy the repressive machinery of the state in order to achieve complete control and replace it with a new state." To this end **he identified the timely use of arms as indispensable** for the triumph of any liberating revolution.

e)  Cuba continued to assist terrorist insurgent organizations and other destabilizing elements in Latin America, Africa, the Middle East, and the United States. Its

support has included training, funding, documentation, and guidance, as well as communications, propaganda, and logistic support. In addition, Cuba has actively promoted contact and cooperation among sometimes disparate or antagonistic groups.

f) The Castro regime maintains a large and complex subversion support apparatus that provides backing for all types of leftist revolutionaries and terrorists.  This support includes everything from guns and funding to asylum and training in the entire range of skills needed by terrorists.

g) The Castro regime has maintained a large and complex apparatus for subversion that supports many leftist revolutionaries and terrorists. This has ranged from arms and funding to safehaven and training-assistance that is indispensable for guerrilla movements and terrorists in Latin America. Castro has given logistic assistance and financial support to thousands of guerrillas and has provided them with military training.

h) Cuba maintains a large and complex apparatus for subversion that has substantially assisted guerrilla movements and terrorists in Latin America. Cuba gives logistic assistance and financial support to thousands of regional subversives-mostly from Central America-and provides them with military training. Havana has close and longstanding relationships with terrorist groups in Chile and Colombia.

i) Havana has long encouraged efforts by Colombian insurgents to unite.

j) Colombia's main insurgent groups formed a new alliance, the Simon Bolivar Guerrilla Coordinator, under the leadership of the Revolutionary Armed Forces of Colombia. The coalition was established to provide a unified political and guerrilla front and we are concerned that it might be used to coordinate terrorist attacks against foreign interests.

k) Since 1959, Cuba has trained and supported guerrillas throughout the world, including Palestinians.  Such training has become increasingly specialized.  Cuba has provided safe haven, weapons, and political and financial support to a wide range of leftist and insurgent organizations that use terrorism in Latin America, including groups from El Salvador, Guatemala, Ecuador. Chile and Colombia.

l) For nearly 30 years now, the Cuban President Fidel Castro has trained and supported guerrillas from many parts of the world, including Palestinians, who have relied in part on terrorist operations against noncombatants to advance their political aims. Cuba has maintained a large and complex apparatus for subversion that has substantially assisted guerrilla movements throughout Latin America, and many of Latin America's radical leftist organizations look to Castro for guidance and advice. Havana has particularly longstanding ties to guerrilla groups in

Colombia. Because of such continuing involvement, the US Government in 1982 put Cuba on its official list of state supporters of terrorism. Cuba continues to provide safehaven, weapons, and political and financial support to a wide range of leftist and insurgent organizations that use terrorism.

m) In Colombia, Cuba provides some training to all major guerrilla groups, and an undetermined number of Colombians travel there each year for training.

n) Cuba continues to serve as a haven for regional revolutionaries and to provide military training, weapons, funds, and guidance to radical subversive groups that use terrorism.  The island today remains a major training center and transit point for Latin subversives and some international groups.  Several rebel organizations have offices and members stationed in Havana. Wounded rebels are often treated in Cuban hospitals. With the demise of the pro-Cuban governments in Panama and Nicaragua, Cuba's support has become even more important to radical groups.

o) Cuba continues to provide limited political training to some leftist organizations. We have no information to confirm that Cuba has closed down its training camps for armed insurgents.

p) Havana does provide safehaven for several international terrorists. Cuba has not renounced political support for groups that engage in international terrorism.

q) Colombia's two main guerrilla groups, the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), maintain representatives in Havana.

r) the Castro regime provided significant levels of military training, weapons, funding, and guidance to leftist extremists worldwide.

s) Cuba is still a safehaven for several international terrorists, maintains close relations with other state sponsors of terrorism, and remains in contact with numerous leftist insurgent groups in Latin America.

t) Cuba, nonetheless, continues to maintain close ties to other state sponsors of terrorism and leftist insurgent groups in Latin America. For instance, Colombia's two main terrorist groups, the FARC and the ELN, maintain representatives in Cuba. Moreover, Havana continues to provide safehaven to a number of international terrorists and US terrorist fugitives.

u) Colombia's two largest terrorist organizations, the Revolutionary Armed Forces of Colombia and the National Liberation Army (ELN), both maintained a permanent presence on the island.

v)  The Cuban Government continued and provided some degree of safehaven and support to members of the Colombian FARC and ELN groups. A Cuban spokesman revealed that Sinn Fein's official representative for Cuba and Latin America, Niall Connolly, who was one of three Irish Republican Army members arrested in Colombia on suspicion of providing explosives training to the FARC, had been based in Cuba for five years.

w) In 2002, Cuba continued to host several terrorists and US fugitives. Havana provided some degree of safehaven and support to members of the Colombian Revolutionary Armed Forces of Colombia (FARC) and National Liberation Army (ELN) groups.

x)  In 2003, Havana permitted up to 20 ETA members to reside in Cuba and provided some degree of safehaven and support to members of FARC and the ELN.

y)  In 2004, Cuba continued to provide limited support to designated Foreign Terrorist Organizations, as well as safehaven for terrorists. Havana provided safehaven and some degree of support to members of the Colombian FARC and ELN guerilla groups.

z)  The Government of Cuba maintains close relationships with other state sponsors of terrorism such as Iran and North Korea, and has provided safe haven to members of ETA, FARC, and the ELN.

aa) Cuba did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank.

bb) The Cuban government did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 Against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank.

cc) The Government of Cuba provided safe haven to members of ETA, the FARC, and the ELN. It maintained close relationships with other state sponsors of terrorism such as Iran and Syria.

dd) The Cuban government continued to provide safe haven to several terrorists. Members of ETA, the FARC, and the ELN remained in Cuba during 2008, Cuban authorities continued to publicly defend the FARC.

ee) The Government of Cuba continued to provide physical safe haven and ideological support to members of three terrorist organizations that are designated as Foreign Terrorist Organizations by the United States.

14

ff) The Government of Cuba has long assisted members of the Revolutionary Armed Forces of Colombia (FARC), and in 2009 continued to provide safe haven to members of the FARC, ELN, and ETA, providing them with living, logistical, and medical support.

gg) Designated as a State Sponsor of Terrorism in 1982, there was no evidence by 2010 that it had severed ties with elements from the Revolutionary Armed Forces of Colombia (FARC).

hh) Members of the Revolutionary Armed Forces of Colombia (FARC) were allowed safe haven in Cuba and safe passage through Cuba.

## THE ACTS OF INTERNATIONAL TERRORISM

43.     The FARC's acts of intentionally shooting at the U.S. civilian aircraft to bring it down constitutes an act of "aircraft sabotage" under 28 U.S.C. §1605A(h)(1).

44.     The FARC's acts of detaining the hostage Plaintiffs, and repeatedly threatening to kill, injure or continue to detain them, in order to compel the Colombian and U.S. governments to release prisoners, or abstain from further action, constitutes an act of "hostage taking" under 28 U.S.C. §1605A(h)(2).

45.     The FARC's murder of Tom Janis, and the neck chaining, forced jungle marches, captivity and other acts of physical and mental cruelty to the hostage Plaintiffs, constitute acts of "extrajudicial killing" or "torture" under 28 U.S.C. §1605A(h)(7)

## CUBA'S STATUTORY LIABILITY

46.     This Court has subject-matter jurisdiction over this case pursuant to the Foreign Sovereign Immunities Act ("FSIA"), which is the sole basis for obtaining jurisdiction over a foreign state.  Although a foreign state is generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions.  When the requirements of one of these exceptions are met and the foreign state is properly served, the FSIA provides both subject-matter jurisdiction over the action and personal jurisdiction over the foreign state.

47.     Congress has enacted a comprehensive terrorism exception to the FSIA that was meant to

waive sovereign immunity and provide terrorism victims with a cause of action in cases

involving certain types of state sponsored terrorism. This terrorism exception is now codified as

28 U.S.C. § 1605A.

48.     The Republic of Cuba is not immune from the jurisdiction of courts of the United States

because money damages are sought herein by Plaintiffs for personal injury or death that was

caused by an act of torture, extrajudicial killing, hostage taking, or the provision of material

support or resources for such an act by an official, employee, or agent of such foreign state while

acting within the scope of his or her office, employment, or agency.  28 U.S.C. §1605A(a)(1).

49.     28 U.S.C. 1605A(a)(2) provides:

> (c), Private Right of Action .—  A foreign state that is or was a state sponsor of
> terrorism as described in subsection (a)(2)(A)(i), … shall be liable to—
>
> (1) a national of the United States,
> *               *        *
> (3) an employee of the Government of the United States, or of an individual
> performing a contract awarded by the United States Government, acting within the
> scope of the employee's employment, or
> (4) the legal representative of a person described in paragraph (1), (2), or (3),
>
> for personal injury or death caused by acts described in subsection (a)(1) of that
> foreign state, or of an official, employee, or agent of that foreign state, for which
> the courts of the United States may maintain jurisdiction under this section for
> money damages. In any such action, damages may include economic damages,
> solatium, pain and suffering, and punitive damages. In any such action, a foreign
> state shall be vicariously liable for the acts of its officials, employees, or agents.

50.     Cuba was designated as a state sponsor of terrorism at the time all of the subject acts of

international terrorism occurred, including the February 13, 2003 extrajudicial killing of Tom Janis,

and the hostage taking and torture of Keith Stansell, Marc Gonsalves and Thomas Howes which

continued until their rescue from captivity on July 2, 2008.  Cuba also remained a designated state sponsor of terrorism within the 6 month period before this action was filed.

51.     Plaintiffs are all U.S. nationals, and at the time of the terrorist acts all four victims were also employees of a Northrup Grumman subsidiary performing a counter-narcotics surveillance contract awarded by the United States Government, and were acting within the scope of their employment.

52.     Plaintiffs have all sustained damages for personal injury or death caused by the FARC's acts of aircraft sabotage, extrajudicial killing, torture, and hostage taking, and which were also caused by Cuba's decades of material support and resources to the FARC which were committed by Cuban officials, employees, or agents while acting within the scope of his or her office, employment, or agency.

## CUBA'S DECADES OF MATERIAL SUPPORT AND RESOURCES TO THE FARC IS REASONABLY CONNECTED TO THE FARC'S TERRORIST ACTS UPON PLAINTIFFS

53.     The U.S. government's factual findings with respect to sponsorship of terrorism, and Cuba's support of international terrorism up to and including the time of Plaintiffs' murder, torture and captivity, include the following factual findings:

- State-Sponsored Terrorism:  In its various forms - provision of sanctuary,  training, financial support, weapons and explosives, and diplomatic encouragement and assistance - **state sponsorship contributes significantly to the capabilities of international terrorist groups, and enables them to operate over a wide geographical range**.  Some states, although not direct sponsors of terrorist organizations contribute to the groups' capabilities by giving them unimpeded transit facilities or by permitting them to engage in trading enterprises.  Assigning responsibility for incidents of state-sponsored terrorism is difficult because the countries concerned mask their involvement.

- **The provision of funding, safehaven, and weapons and logistic support to terrorists by sovereign states is crucial to the operation of many international terrorist organizations**.

- State sponsors of terrorism provide critical support to non-state terrorist groups. **Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations**.

54. Plaintiffs are not required to prove that Cuba's decades of material support and resources to the FARC contributed directly to any of the specific terrorist acts committed by the FARC.  Nor are Plaintiffs required to show any "but for" causation.

55. Cuba's decades or material support and resources to the FARC, as officially documented by the United States, including provision of weapons, specialized military training, financial support, medical care and treatment, safe haven, safe passage, documentation, guidance, communications, propaganda, logistic support to the FARC, and provision of secure transshipment facilities for the global distribution of FARC cocaine,  has more likely than not:

a) enabled the FARC to avoid defeat by the Colombian military which would otherwise have killed or captured the FARC terrorist perpetrators long before February 13, 2003 when Tom Janis was murdered;

b) enabled the FARC to procure weapons, including Soviet AK-47s and other high caliber weapons, that were used to shoot down Plaintiffs' Cessna on February 13, 2003, then murder Tom Janis and threaten the hostages throughout their 1,967 days of captivity by multiple FARC fronts;

c) enabled the FARC to procure chains, fencing, barbed wire, radios, and other equipment and supplies that were ultimately used in 2003 to 2008 upon Plaintiffs;

d) enabled the FARC to procure food, clothing and salaries for its members, thereby enabling the FARC to continue operations throughout the years up to and including 2003 to 2008;

e) enabled the FARC to continue its long practice of forcing young boys and girls to join the FARC upon threat of murdering their parents or siblings, which generation of forced conscripts then continued in service to perpetrate the terrorist acts upon Plaintiffs from  2003 to 2008;

f) enabled the FARC to maintain its psychological control through propaganda and fear tactics taught by Cuba, including the FARC's ever present threat of killing any FARC members who attempted to demobilize or lay down arms to rejoin Colombian society;

g) prevented the FARC members who would otherwise have defected long before committing the terrorist acts upon Plaintiffs;

h) enabled the FARC to procure medical supplies, medical care and treatment from Cuban doctors in Venezuela, thereby reinforcing the FARC each and every year and prolonging their likely defeat by Colombian military;

i) encouraged and emboldened the FARC to shoot down a U.S. civilian aircraft after seeing its Cuban state sponsor do that exact thing in 1996 to a Brothers to the Rescue civilian plane;

j) enabled the FARC to maintain control of large sections of Colombia, including the Venezuelan border region where Plaintiffs were temporarily marched to avoid Colombian military, and the areas where the plane was shot down, Tom Janis was killed, and the hostages were marched and tortured and held hostage;

k) enabled the FARC to regroup and recover from sustained Colombian military combat operations prior to 2003, thereby prolonging their ability to commit the subject terrorist acts upon Plaintiffs from 2003 to 2008;

l) substantially contributed to the FARC's ability to maintain and continually sequester the American hostages over a five year period over vast geographical areas of Colombia and Venezuela;

m) enabled the FARC to expand its distribution of cocaine globally without detection and to use such profits to train, recruit, organize, command, and control the FARC members who committed the terrorist acts upon Plaintiffs'; and

n) facilitated the funneling of money from Cuba to the FARC for use in the FARC's terrorist operations, including hostage-taking and extrajudicial killing.

56.     Cuba's material support and resources provided to the FARC for over four decades is reasonably connected to the FARC's kidnapping, torture, and murder of Plaintiffs.

57.     The consequences of the decades of Cuba's material support and resources to the FARC were reasonably certain, and more likely than not, to include terrorist acts against U.S. nationals such as the FARC's aircraft sabotage and extrajudicial killing of Tom Janis on February 13, 2003, and the ensuing hostage taking and torture of Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant REPUBLIC OF CUBA as follows:

KEITH STANSELL, for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life;

MARC GONSALVES, for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life; and

THOMAS HOWES for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life.

JUDITH JANIS, as the surviving spouse of Thomas Janis, deceased:  for her past and future loss of solatium, mental anguish, bereavement, grief, loss of spousal society, comfort, affections and guidance;

CHRISTOPHER  JANIS as the surviving son of Thomas  Janis, deceased:  for his past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

MICHAEL JANIS as the surviving son of Thomas Janis, deceased:  for his past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

GREER JANIS as the surviving daughter of Thomas Janis, deceased:  for her past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

JONATHAN  JANIS as the surviving son of Thomas  Janis, deceased:  for his past and

future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort,

affections and guidance;


DATED: September 14, 2015

/s/ Newt Porter
NEWTON P. PORTER
Trial Counsel
(Bar No. 432052)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Facsimile:     (305) 668-9154
Attorneys for Plaintiffs

/s/ Tony P. Korvick
TONY P. KORVICK
Trial Counsel
(Bar No. FL 003)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Facsimile:     (305) 668-9154
Attorneys for Plaintiffs