EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS DE AMÉRICA
PARA EL DISTRITO DE COLUMBIA

KEITH STANSELL,                                  N.° DE CAUSA:
MARC GONSALVES,
THOMAS HOWES,
JUDITH G. JANIS,
CHRISTOPHER T. JANIS,
MICHAEL I. JANIS,
GREER JANIS, y
JONATHAN JANIS,

      Los Demandantes,
contra

LA REPÚBLICA DE CUBA

      La Demandada.

_____/

### DEMANDA

Los Demandantes entablan acción legal contra la Demandada y alegan:

### LA ACCIÓN, JURISDICCIÓN Y COMPETENCIA

1.     Se trata de una acción civil por daños y perjuicios originados en el hecho de que la Demandada

ha proporcionado, durante más de cuatro décadas, apoyo material o recursos a la Organización

Terrorista Extranjera ("FTO", por sus siglas en inglés) designada que se conoce como FUERZAS

ARMADAS REVOLUCIONARIAS DE COLOMBIA ("FARC") y a sus miembros, en apoyo al

terrorismo internacional. El apoyo de la Demandada condujo a una serie de actos de terrorismo

internacional que perpetraron las FARC sobre los Demandantes a partir del 13 de febrero de 2003,

cuando el avión de estos fue derribado en Colombia. Los Demandantes eran ciudadanos civiles

estadounidenses que volaban en un avión civil registrado en la FAA en una misión de vigilancia

antinarcóticos en el momento en que el avión fue derribado. Luego de un aterrizaje forzoso exitoso,

las FARC dispararon y asesinaron al piloto, THOMAS JANIS. Las FARC detuvieron a KEITH

**CERTIFIED TRANSLATION**
**PREPARED BY**
**SEVEN LANGUAGES, INC.**

STANSELL, MARC GONSALVES y a THOMAS HOWES, a quienes mantuvieron cautivos y torturaron en la selvas de Colombia y de Venezuela durante más de 5 años hasta el 2 de julio de 2008 (un total de 1.967 días en cautiverio).

2.      Esta acción se presenta de conformidad con el título 28, sección 1605A del Código de los Estados Unidos de América que establece la excepción por terrorismo al principio de inmunidad jurisdiccional de un estado extranjero establecida en la Ley de Inmunidades a Soberanías Extranjeras.

3.      Este Tribunal tiene jurisdicción sobre el objeto de la presente acción de acuerdo con el título 28, secciones 1605A(a) y (c) del referido código debido a que los Demandantes son todos ciudadanos estadounidenses, y eran civiles ejecutando un contrato suscrito con el gobierno estadounidense que contemplaba actividades antinarcóticos y estuvieron sometidos a actos de terrorismo internacional, entre otros a torturas, ejecución extrajudicial, toma de rehenes, y por cuanto el suministro de apoyo material y de recursos que brindó Cuba contribuyó a ocasionar estos actos de terrorismo internacional, mientras que Cuba era designada como un estado patrocinador del terrorismo y mantuvo esa designación en el periodo de seis meses previo a la presentación de esta acción.

4.      La competencia en este distrito es adecuada debido al considerable daño moral, angustia mental, duelo, sufrimiento, desaparición física de cónyuges y padres, y a la falta de confort y de orientación que se produjo, y a la que estuvieron sometidos en este distrito los familiares que sobrevivieron a TOM JANIS, fallecido, y estos daños y perjuicios han dado origen a esta demanda. Título 28, sección 1391(f)(1) del Código de los Estados Unidos de América.

5.      Esta acción se presenta oportunamente dentro del lapso de los 10 años siguientes a los hechos que configuran la causal de demanda contados a partir del rescate de los rehenes secuestrados por las FARC, y la confirmación resultante que recibió la familia Janis de que fueron en efecto las FARC

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

2

quienes asesinaron a Tom Janis.  Título 28, sección 1605A(b) del Código de los Estados Unidos de América

## LOS DEMANDANTES

6.      El Demandante KEITH STANSELL es un ciudadano estadounidense, con residencia en el estado de la Florida.   Keith Stansell es un ex marine de los EE. UU. y era el comandante en jefe del vuelo antinarcóticos del 13 de febrero de 2003.

7.      El Demandante MARC GONSALVES es un ciudadano estadounidense, con residencia en el estado de la Florida. Marc Gonsalves es un especialista en sistemas electrónicos de vigilancia y era el analista principal antinarcóticos y oficial de recolección (collection officer) en el vuelo del 13 de febrero de 2003.

8.      El Demandante THOMAS HOWES es un ciudadano estadounidense, con residencia en el estado de la Florida. Thomas Howes es un piloto altamente experimentado y era el segundo piloto al mando en el vuelo del 13 de febrero de 2003.

9.      THOMAS JANIS era un ciudadano estadounidense, que residía en el condado de Montgomery, estado de Alabama cuando las FARC lo asesinaron el 13 de febrero de 2003.  THOMAS JANIS era el piloto a cargo del vuelo del 13 de febrero de 2003.  THOMAS JANIS era un aviador retirado del ejército estadounidense y miembro de la Unidad de Operaciones Especiales del Ejército de los EE. UU. - Delta Force, jubilado de la milicia estadounidense después de 32 de años, y había sido condecorado con la Estrella de Bronce y la Medalla de Aviación con el Emblema de Distinción por Valor en Combate.

10.     La Demandante JUDITH JANIS es ciudadana estadounidense y residente del condado de Montgomery, en Alabama y es el cónyuge supérstite de Thomas Janis.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

11.      El Demandante CHRISTOPHER JANIS es ciudadano estadounidense e hijo supérstite de Thomas Janis.  Christopher Janis se retiró recientemente del servicio activo del Ejército de los EE. UU., después de múltiples periodos de servicio en combate y actualmente vive en este distrito en Dadeville, condado de Tallapoosa, en Alabama.

12.      La Demandante GREER JANIS es ciudadana estadounidense e hija supérstite de Thomas Janis, y reside actualmente en el estado de Colorado.

13.      El Demandante MICHAEL JANIS es ciudadano estadounidense e hijo supérstite de Thomas Janis.  Michael Janis presta actualmente servicio activo en el Ejército estadounidense y está en un periodo de servicio en combate como aviador en Afganistán.

14.      El Demandante JONATHAN JANIS es ciudadano estadounidense e hijo supérstite de Thomas Janis, y reside actualmente en el estado de California.

## PARTE DEMANDADA

15.      La República de Cuba es un estado extranjero según la definición del título 28, sección 1603(a) del Código de los Estados Unidos de América, y estuvo en la lista de países patrocinadores del terrorismo durante 33 años aproximadamente.  Cuba ha tenido un régimen comunista desde sus inicios, y cuenta con una larga historia de exportación del comunismo y de patrocinio del terrorismo en toda Latinoamérica, Europa y África.

16.      La República de Cuba fue incorporada por primera vez a la lista de países patrocinadores del terrorismo en 1982, de conformidad con la Sección 6(j) de la Ley de Administración de Exportaciones de 1979 (Ley Pública 96-72) con base en los vínculos de Cuba con el terrorismo internacional y su apoyo a grupos terroristas en Latinoamérica.

17.      La "lista de estados patrocinadores del terrorismo" está prevista bajo la Sección 6(j) de la Ley de Administración de Exportaciones de 1979, modificada (Ley Pública 96-72; título 50, sección

4

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

2405(j) del Código de los Estados Unidos de América,  conforme a la cual la Secretaría de Estado determina cuando un país "ha proporcionado apoyo en repetidas ocasiones a actividades de terrorismo internacional".

18.     En todo momento relevante  a esta acción, desde el asesinato de TOM JANIS por parte de las FARC el 13 de febrero de 2003, y durante los 1.967 días que los rehenes fueron torturados y mantenidos en cautiverio hasta su rescate el 2 de julio de 2008, la República de Cuba permaneció designada como un estado patrocinador del terrorismo.

19.     La República de Cuba no fue removida de la lista de países patrocinadores del terrorismo hasta el 29 de mayo de 2015, menos de seis meses antes de la fecha en que se presentó esta acción.

20.     En 1996, el Congreso [estadounidense] formuló los siguientes hallazgos oficiales en relación con el gobierno de Cuba:

- El gobierno de Cuba participa en comercio ilegal de narcóticos a nivel internacional y alberga a fugitivos de la justicia de los EE. UU.;

- El gobierno de Castro amenaza la paz y la seguridad internacional al participar en actos de subversión armada y de terrorismo, tales como el entrenamiento y aprovisionamiento a grupos dedicados a la violencia internacional; y

- Durante los últimos 36 años, el gobierno cubano ha representado y continúa representando una amenaza a la seguridad nacional de los Estados Unidos de América.

Ley de Libertad y Solidaridad Democrática Cubanas (Libertad) de 1996, título 22, secciones 6021-6091 del Código de los Estados Unidos de América, Sección 2, Hallazgos.

21.     Cuba estaba debidamente advertida y en conocimiento de que su apoyo a grupos terroristas antiestadounidenses como las FARC podrían someter a ese país a la jurisdicción de los tribunales de los EE. UU. por motivos de responsabilidad civil.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

22.     La decisión de Cuba de brindar deliberadamente apoyo material y recursos a organizaciones FTO antiestadounidenses, como las FARC, y el hecho de que las lesiones, situación de cautiverio y muerte a que estuvieron sometidos los Demandantes se originaron por actividades terroristas, posibilitan el que Cuba "anticipe de forma razonable que pudiera ser arrastrada" a un tribunal estadounidense.

23.     Cuba ha destinado apoyo de forma deliberada a las FARC, FTO que ha atacado a ciudadanos estadounidenses, y por lo tanto está sujeta a la jurisdicción personal de este Tribunal, lo que resulta compatible con los principios de justicia y equidad.

### INTENCIÓN DELIBERADA DE LAS FARC DE PERPETRAR ACTIVIDADES TERRORISTAS CONTRA CIUDADANOS ESTADOUNIDENSES

24.     En 1964, las FARC se establecieron como el ala militar del Partido Comunista Colombiano.

25.     El 8 de octubre de 1997, el Secretario de Estado de los Estados Unidos de América, designó a las FARC como organización terrorista extranjera (FTO), conforme al título 8, Sección 1189 del Código de los Estados Unidos de América.  Las FARC fueron designadas nuevamente como FTO el 5 de septiembre de 2001.  En todo momento relevante a esta acción, las FARC son una organización terrorista extranjera designada.  Específicamente el título 8, sección 1189(a)(1) del Código de los Estados Unidos de América autoriza al Secretario de Estado a que designe a una organización como FTO. . . si el Secretario de Estado determina que (A) la organización es una organización extranjera; (B) la organización participa en actividades terroristas . . . ; y (C) las actividades terroristas o el terrorismo de la organización amenaza la seguridad de los ciudadanos estadounidenses o la seguridad nacional de los Estados Unidos de América. Título 8, sección 1189(a)(1) del Código de los Estados Unidos de América.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

26.     Las FARC son asimismo Terroristas Mundiales Especialmente Designados ("SDGT", por sus siglas en inglés), en virtud de la Orden Ejecutiva Presidencial 13224 de la Ley de Poderes Económicos para Emergencias Internacionales (IEEPA, por sus siglas en inglés).

27.     Las FARC son un grupo terrorista que lleva a cabo actividades de terrorismo internacional, entre las que se incluyen violencia premeditada con motivaciones políticas, amenazas de violencia, toma de rehenes, asesinatos y otras actividades terroristas perpetradas contra objetivos no combatientes, incluyendo ciudadanos estadounidenses.  Las FARC ejecutan actividades terroristas a nivel nacional e internacional a fin de influenciar la política colombiana y estadounidense.

28.     Las FARC conspiraron para derribar un avión estadounidense, secuestrar a ciudadanos estadounidenses, o asesinarlos, mantenerlos cautivos y difundir sus fotografías alrededor del mundo con el propósito expreso de infundir terror en la población estadounidense y de intentar influenciar la política de los gobiernos de los EE. UU. y de Colombia.

29.     Las FARC son una organización con un alto sentimiento antiestadounidense, han atacado específicamente a ciudadanos estadounidenses y han emprendido actos de violencia contra estos y contra ciudadanos colombianos.

30.     Las FARC han emitido declaraciones públicas en inglés y en español expresando posiciones antiestadounidenses, señalando como objetivos de sus acciones a ciudadanos de los EE. UU. y condenando las políticas del referido país.

31.     El 13 de febrero de 2003, los Demandantes estaban llevando a cabo una misión de vigilancia antinarcóticos en un avión estadounidense registrado en la FAA, cuando las FARC abrieron fuego contra la aeronave.  La investigación posterior al siniestro reveló que las FARC habían impactado el avión con disparos de ametralladoras de alto calibre antes del aterrizaje forzoso.

7

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

32.     Miembros de las FARC han admitido que dicha organización disparó intencionalmente contra el avión para derribarlo, capturar a su tripulación, a sabiendas de que era un avión estadounidense y que su tripulación estaba conformada también por ciudadanos estadounidenses.

33.     Los cinco ocupantes del avión sobrevivieron el aterrizaje forzoso, pero fueron capturados inmediatamente por terroristas de las FARC, quienes rápidamente localizaron el avión derribado.   A minutos del aterrizaje, miembros de las FARC habrían disparado y asesinado al piloto estadounidense, Thomas Janis, y al soldado colombiano, Luis Alcides Cruz y sus cuerpos fueron abandonados a poca distancia del avión siniestrado.   Los otros tres rehenes estadounidenses, Keith Stansell, Marc Gonsalves y Thomas Howesfueron capturados a la fuerza,  tomados como rehenes, y llevados a la selva por miembros de las FARC, donde los mantuvieron secuestrados durante 1.967 días hasta su rescate el 2 de julio de 2008.

34.     Thomas Janis, fallecido, era piloto jubilado de la Unidad de Operaciones Especiales del Ejército estadounidense, y había prestado su último periodo en servicio activo antes de jubilarse como Oficial Técnico 5 y Comandante de Elementos de Ala Fija para el Destacamento Operacional de Fuerzas Especiales.  Luego de su jubilación de las fuerzas armadas en 1998, Thomas Janis fue contratado como civil para misiones de reconocimiento y vigilancia aéreas en Colombia, en apoyo a la guerra mundial contra el terrorismo y el tráfico de drogas.

35.     Aproximadamente dos meses después del derribamiento del avión, el 27 de abril de 2003, las FARC emitieron un comunicado público en el que se atribuían la captura y secuestro de los tres rehenes estadounidenses.   En esa carta pública, publicada a los Estados Unidos de América, las FARC ofrecieron liberar a aproximadamente 250 ciudadanos colombianos de alto nivel que estaban secuestrados para ese entonces, junto con los tres estadounidenses capturados el 13 de febrero de 2003, a cambio de ciertas concesiones del gobierno colombiano y de influenciar ilegalmente la

8

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

política de los EE. UU. Las FARC exigieron al gobierno colombiano que estableciera en su territorio soberano una zona desmilitarizada (DMZ, por sus siglas en inglés), que sería utilizada como nueva base de operaciones de las FARC, y que liberara a cientos de terroristas de las FARC actualmente en manos de las autoridades colombianas, como condición para la liberación de los tres estadounidenses secuestrados.

36.     En julio de 2003, las FARC forzaron a los Demandantes, Keith Stansell, Marc Gonsalves y Thomas Howes a participar en una entrevista grabada para demostrar que estaban con vida y en cautiverio en manos de la organización guerrillera.  Uno de los principales líderes de las FARC, Mono Jojoy, dijo a los Demandantes, Keith Stansell, Marc Gonsalves y Thomas Howes que el comandante de las FARC "nos había ordenado … enviar una prueba a sus familiares de que estaban con vida".  Las familias de los Demandantes vivían en los EE. UU.  La "prueba de vida" fue entregada a CBS News, una organización estadounidense de medios de comunicación ubicada en Nueva York y que transmite en todos los EE. UU.

37.     Las FARC exigieron, en una comunicación publicada en los EE. UU., la liberación de dos terroristas de las FARC sentenciados en los Estados Unidos o asesinarían, lesionarían y continuarían reteniendo a la fuerza a los Demandantes.

38.     Los actos de las FARC tenían la intención de intimidar o presionar a la población colombiana y estadounidense, de influenciar la política del gobierno de los EE. UU., mediante la intimidación o la coerción, y de repercutir en la conducta de un gobierno mediante secuestros, toma de rehenes y asesinatos.

39.     El suministro de apoyo material que Cuba brindó a las FARC permitió que esta organización perpetrara actos de terrorismo internacional entre los que se incluyen los siguientes:

a)  atacaron a personas y empresas estadounidenses;

9

b) participaron en comunicaciones de radio de dos vías para informarse entre ellos de la presencia del avión de los Demandantes en el área de operaciones de la Columna Móvil Teófilo Morero de las FARC;

c) obtuvieron permiso para atacar el avión que las FARC sabían que transportaba ciudadanos estadounidenses;

d) atacaron la aeronave con armas de fuego y luego capturaron y secuestraron a ciudadanos estadounidenses, una vez que el avión había aterrizado forzosamente;

e) dispararon y asesinaron a un ciudadano estadounidense - el piloto del avión derribado;

f) dispararon y asesinaron a un soldado colombiano que formaba parte de la tripulación del avión siniestrado;

g) forzaron a los Demandantes a abandonar el lugar del avión derribado con el uso de armas y fuerza letal y los tomaron como rehenes;

h) transportaron a los Demandantes en repetidas ocasiones hacia zonas remotas alejadas del sitio donde los tenían secuestrados con el uso de armas y fuerza letal, con los cuellos encadenados durante largas caminatas a través de selvas densas;

i) retuvieron a los rehenes con guardias armados, bajo amenaza de muerte, en varias zonas de la selva;

j) asignaron a miembros específicos de la FARC para que ejecutaran a los Demandantes en caso de que se llevara a cabo un intento de rescate;

k) llevaron a cabo con los Demandantes procedimientos médicos sadistas en la selva cuando estos estaban lesionados o heridos;

l) hicieron pasar hambre a los Demandantes durante largos periodos;

m) encadenaron a los Demandantes con cadenas para camiones;

n) exigieron que el gobierno colombiano creara una zona desmilitarizada y realizara un intercambio de prisioneros con las FARC como condiciones explícitas para la liberación de los Demandantes/rehenes;

o) prepararon y publicaron videos tomados a la fuerza, utilizados como pruebas de vida y que fueron transmitidos en los Estados Unidos de América;

p) designaron a comandantes con antigüedad y experiencia en negociaciones para representar a las FARC en las negociaciones con el gobierno colombiano para la liberación de los Demandantes/rehenes estadounidenses secuestrados por las FARC;

10

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

q) obtuvieron documentos de identificación falsos y fraudulentos para facilitar la participación en la negociación de las exigencias de las FARC para la liberación de los Demandantes/rehenes estadounidenses en manos de las FARC;

r) escondieron la ubicación de los Demandantes/rehenes;

s) sometieron a los Demandantes/rehenes a condiciones crueles e inhumanas que les causaron enfermedades, lesiones mentales y físicas y traumas;

t) negaron a los Demandantes/rehenes una alimentación y atención médica adecuadas;

u) solicitaron y recibieron apoyo material de varias personas y empresas extranjeras con operaciones en Colombia, y en otros países fuera de Colombia, incluyendo el pago de dinero a cambio de protección, así como suministros, transporte, logística, atención y tratamiento médico para terroristas de las FARC;

v) solicitaron y recibieron apoyo financiero de varios bancos extranjeros e instituciones financieras no bancarias, lavadores de dinero, cambistas, ciudadanos extranjeros y personas de interés, grupos no gubernamentales e instituciones de beneficencia, sociedades fantasma que incluyen el lavado del dinero procedente de los ingresos de las actividades delictivas de las FARC, así como de otros servicios bancarios y de transacciones financieras para apoyar las actividades constantes de las FARC de toma de rehenes, secuestros y narcotráfico;

w) se aprovecharon del sistema bancario estadounidense a través de bancos extranjeros, instituciones financieras no bancarias, cambistas y lavadores de dinero, ciudadanos estadounidenses y extranjeros con cuentas extranjeras o privilegios para usar cuentas puente para enviar, dirigir, desviar y ocultar, apoyo financiero para actividades terroristas, asesinatos, toma de rehenes, mantenimiento de rehenes en cautiverio y de los terrorista a cargo de la vigilancia de los rehenes, operación de comunicaciones y seguimiento encubierto a gobiernos locales, así como para establecer logísticas y líneas de suministro para actividades ilegales, entre ellas el narcotráfico.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

## ANTECEDENTES DE CUBA PROPORCIONANDO APOYO MATERIAL Y RECURSOS A TERRORISTAS, ENTRE ELLOS A LAS FARC

40.     El título 28, sección 1605(h)(3) del Código de los Estados Unidos de América establece que el "apoyo material o recursos" tiene el significado dado a ese término en la sección 2339A del título 18, que indica además que:

> (1) el término "apoyo material o recursos" significa cualquier propiedad tangible o intangible, o servicios, incluyendo dinero o valores monetarios o instrumentos financieros, servicios financieros, alojamiento, entrenamiento, asesoramiento o asistencia de expertos, pisos francos, documentación o identificación falsa, equipos de comunicaciones, instalaciones, armas, sustancias letales, explosivos, personal (1 o más individuos que pueden ser o incluirse a sí mismos), y transporte, excepto medicamentos o materiales religiosos.

Título 18, sección 2339A(b)(1) del Código de los Estados Unidos de América.

41.     El gobierno de los Estados Unidos de América ha hecho oficial los informes anuales sobre hallazgos en relación con el apoyo brindado por Cuba al terrorismo internacional, entre los cuales figuran los indicados en los informes anuales preparados por el Centro de Evaluación Extranjera Nacional (NFAC, por sus siglas en inglés) de la Agencia Central de Inteligencia, el informe sobre "Patrones del Terrorismo Mundial" del Departamento de Estado y su "Informe sobre Terrorismo por Países". Estos hallazgos constituyen una acción final por parte de la agencia y merecen a un mayor grado de consideración por parte del Tribunal que el otorgado bajo el estándar <u>Chevron</u>.

42.     Los hallazgos del gobierno estadounidense con relación al patrocinio del terrorismo, en general, y el apoyo de Cuba al terrorismo internacional hasta, e incluso, el momento del asesinato, tortura y secuestro de los Demandantes, incluyen los siguientes hallazgos:

a) En Latinoamérica, la Unión Soviética y Cuba parecen estar concentrados en una campaña coordinada a largo plazo para establecer en la región regímenes solidarios. Los cubanos claramente apoyan organizaciones y grupos en Latinoamérica que utilizan el terrorismo como una técnica básica para debilitar regímenes existentes.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

b) La Habana abiertamente apoya y defiende la revolución armada como el único medio para que las fuerzas izquierdistas obtengan poder en Latinoamérica. Cuba apoya también a organizaciones y grupos en Latinoamérica que utilizan el terrorismo para debilitar regímenes existentes. Los cubanos han desempeñado un rol importante en facilitar el movimiento de hombres y armas en Centro y Suramérica, brindando apoyo directo bajo la forma de entrenamiento, armas, refugios seguros, y asesoramiento a una amplia variedad de grupos guerrilleros.

c) En sus esfuerzos por promover una revolución armada por parte de fuerzas izquierdistas en Latinoamérica, Cuba apoya organizaciones y grupos que utilizan el terrorismo para debilitar regímenes existentes. En cooperación con los soviéticos, los cubanos han facilitado el movimiento de personas y armamento hacia Centro y Suramérica y han suministrado de manera directa financiamiento, entrenamiento, armas, refugios seguros y asesoramiento a una amplia variedad de grupos guerrilleros y terroristas individuales.

d) Manuel Piñeiro Losada, jefe del Departamento América del Comité Central del Partido Comunista, reafirmó el compromiso de Cuba con el proceso revolucionario - **incluyendo el apoyo de grupos que usan el terrorismo** - en la Conferencia Teórica Internacional de 1982. Piñeiro enfatizó el principio fundamental Marxista-Leninista de la necesidad de "destruir la maquinaria represiva de estado para lograr un control completo y reemplazarlo con un nuevo estado". En consecuencia, **identificó el uso oportuno de armas como indispensable** para el triunfo de cualquier revolución liberadora.

e) Cuba continuó apoyando a organizaciones terroristas insurgentes y a otros elementos desestabilizadores en Latinoamérica, África, Medio Oriente y los Estados Unidos de América. Su apoyo ha incluido entrenamiento, financiamiento, documentación y orientación, así como comunicaciones, propaganda y apoyo logístico. Adicionalmente, Cuba ha promovido el contacto y la cooperación entre grupos en ocasiones dispares o antagónicos.

f) El régimen de los Castro mantiene un complejo aparato de apoyo a la subversión que proporciona respaldo a cualquier tipo de revolucionarios izquierdistas y terroristas. Este apoyo incluye absolutamente todo desde armas y financiamiento hasta asilo y entrenamiento en un rango completo de destrezas que requieren los terroristas.

g) El régimen de los Castro ha mantenido un complejo y extenso aparato para respaldar la subversión que apoya a muchos revolucionarios izquierdistas y terroristas, y que abarca desde el suministro de armas y financiamiento a refugios seguros y asistencia en el entrenamiento indispensable para movimientos de guerrilla y terroristas en Latinoamérica. Castro ha brindado asistencia logística y apoyo financiero a miles de guerrillas y les ha proporcionado entrenamiento militar.

**CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.**

h) Cuba mantiene un complejo y extenso aparato para respaldar la subversión que ha ayudado sustancialmente a movimientos de guerrilla y a terroristas en Latinoamérica. Cuba ha proporcionado ayuda logística y apoyo financiero a miles de subversivos regionales, en su mayoría de Centroamérica, y les ha suministrado entrenamiento militar. La Habana tiene relaciones cercanas y de larga data con grupos terroristas en Chile y Colombia.

i) La Habana ha alentado por mucho tiempo los esfuerzos de insurgentes colombianos para unirse.

j) Los principales grupos insurgentes en Colombia formaron una nueva alianza, la Coordinadora Guerrillera Simón Bolívar, bajo el liderazgo de las Fuerzas Armadas Revolucionarias de Colombia. La coalición se estableció para brindar un frente político y guerrillero unificado y nos preocupa que se pueda usar para coordinar ataques terroristas contra intereses extranjeros.

k) Desde 1959, Cuba ha entrenado y apoyado grupos guerrilleros en todo el mundo, incluyendo a los palestinos. Tal entrenamiento se ha hecho cada vez más especializado. Cuba ha brindado refugio seguro, armas, así como apoyo político y financiero a una amplia gama de organizaciones izquierdistas e insurgentes que utilizan el terrorismo en Latinoamérica, entre los que se incluyen grupos de El Salvador, Guatemala, Ecuador, Chile y Colombia.

l) Por casi ya 30 años, el presidente cubano Fidel Castro ha entrenado y apoyado grupos guerrilleros en muchas partes del mundo, incluyendo a los palestinos, quienes se han basado en parte en operaciones terroristas contra no combatientes para avanzar en sus objetivos políticos. Cuba ha mantenido un complejo y extenso aparato para apoyar la subversión que ha ayudado sustancialmente a movimientos de guerrilla en toda Latinoamérica, y muchas organizaciones izquierdistas radicales buscan en Castro orientación y asesoramiento. La Habana tiene vínculos de muy larga data con grupos de la guerrilla en Colombia. Debido a esta participación continua, el gobierno estadounidense colocó en 1982 a Cuba en la lista oficial de países patrocinadores del terrorismo. Cuba sigue ofreciendo refugio seguro, armas, así como apoyo financiero y político a una amplia gama de organizaciones izquierdistas e insurgentes que emplean el terrorismo.

m) En Colombia, Cuba proporciona entrenamiento a todos los grupos principales de guerrilla, y un número no determinado de colombianos viajan a la isla cada año a recibir capacitación.

n) Cuba sigue sirviendo como refugio seguro para revolucionarios regionales y proporciona entrenamiento militar, armas, fondos, y asesoramiento a grupos subversivos radicales que usan terrorismo. La isla actualmente sigue siendo un centro importante de entrenamiento y punto de tránsito para subversivos latinoamericanos y algunos grupos internacionales. Algunas organizaciones de

14

**CERTIFIED TRANSLATION**
**PREPARED BY**
**SEVEN LANGUAGES, INC.**

rebeldes tienen oficinas y miembros instalados en la Habana. Los rebeldes heridos con frecuencia reciben tratamiento en hospitales cubanos. Con la caída de gobiernos pro-Cuba en Panamá y Nicaragua, el apoyo de Cuba ha pasado a ser aun más importante para los grupos radicales.

o) Cuba continúa brindando entrenamiento político limitado a ciertas organizaciones izquierdistas. No tenemos información que confirme que Cuba ha cerrado los campos de entrenamiento para insurgentes armados.

p) La Habana proporciona refugio seguro para varios terroristas internacionales. Cuba no ha cesado en su apoyo político a grupos que participan en terrorismo internacional.

q) Los dos principales grupos guerrilleros en Colombia, las Fuerzas Armadas Revolucionarias de Colombia (FARC) y el Ejército de Liberación Nacional (ELN), mantienen representantes en La Habana.

r) El régimen de Castro proporcionó niveles importantes de entrenamiento militar, armas, financiamiento y orientación a extremistas izquierdistas alrededor del mundo.

s) Cuba sigue siendo un refugio seguro para varios terroristas internacionales, mantiene estrechas relaciones con otros países patrocinadores del terrorismo y sigue en contacto con numerosos grupos izquierdistas insurgentes en Latinoamérica.

t) Cuba, no obstante, sigue manteniendo estrechos vínculos con otros países patrocinadores del terrorismo y con grupos izquierdistas insurgentes en Latinoamérica. Por ejemplo, los dos principales grupos terroristas en Colombia, las FARC y el ELN, mantienen representantes en Cuba. Más aún, la Habana continúa brindando refugio seguro a un número de terroristas internacionales y de terroristas fugitivos de los EE. UU.

u) Las dos organizaciones terroristas más importantes de Colombia, las Fuerzas Armadas Revolucionarias de Colombia y el Ejército de Liberación Nacional (ELN), mantienen una presencia permanente en la isla.

v) El gobierno cubano sigue proporcionando cierto grado de refugio seguro y de apoyo a miembros de los grupos de las FARC y del ELN de Colombia. Un vocero cubano reveló que el representante oficial del Sinn Féin para Cuba y Latinoamérica, Niall Connolly, quien fuera uno de los tres miembros del Ejército Republicano Irlandés arrestados en Colombia bajo la sospecha de suministrar entrenamiento sobre explosivos a las FARC, ha estado radicado en Cuba por cinco años.

w) En 2002, Cuba continuó hospedando a varios terroristas y fugitivos de los EE. UU. La Habana proporcionó cierto grado de refugio seguro y apoyo a miembros de los

15

**CERTIFIED TRANSLATION**
**PREPARED BY**
**SEVEN LANGUAGES, INC.**

grupos de las Fuerzas Armadas Revolucionarias de Colombia (FARC) y del Ejército de Liberación Nacional (ELN) de Colombia.

x) En 2003, la Habana permitió que hasta 20 miembros de la ETA vivieran en Cuba y brindó cierto grado de refugio seguro y apoyo a miembros de las FARC y del ELN.

y) En 2004, Cuba continuó ofreciendo apoyo limitado a Organizaciones Terroristas Extranjeras designadas, además de refugio seguro a terroristas. La Habana proporcionó refugio seguro y cierto grado de apoyo a miembros de los grupos guerrilleros de las FARC y del ELN de Colombia.

z) El gobierno de Cuba mantiene relaciones estrechas con otros países patrocinadores del terrorismo como Irán y Corea del Norte, y ha brindado refugio seguro a miembros de la ETA, las FARC y el ELN.

aa) Cuba no intentó hacerle seguimiento, bloquear o decomisar los activos de los terroristas, si bien la autoridad para hacerlo está contemplada en la Ley 93 de Cuba contra Actos de Terrorismo, así como en la Instrucción 19 de la Superintendencia del Banco Central de Cuba.

bb) El gobierno cubano no intentó hacerle seguimiento, bloquear o decomisar los activos de los terroristas, si bien la autoridad para hacerlo está contemplada en la Ley 93 de Cuba contra Actos de Terrorismo, así como en la Instrucción 19 de la Superintendencia del Banco Central de Cuba.

cc) El gobierno cubano proporcionó refugio seguro a miembros de la ETA, las FARC y el ELN. Mantuvo estrechas relaciones con otros países patrocinadores del terrorismo, tales como Irán y Siria.

dd) El gobierno cubano continuó brindando refugio seguro a varios terroristas. Miembros de la ETA, las FARC y el ELN permanecieron en Cuba durante 2008, las autoridades cubanas siguieron defiendo públicamente a las FARC.

ee) El gobierno cubano continúa proporcionando refugio seguro y apoyo ideológico a miembros de tres organizaciones terroristas que están designadas por los Estados Unidos de América como Organizaciones Terroristas Extranjeras.

ff) El gobierno cubano ha brindado asistencia durante largo tiempo a miembros las Fuerzas Armadas Revolucionarias de Colombia (FARC), y en 2009, continuó ofreciendo refugio seguro a miembros de las FARC, del ELN y de la ETA, proporcionándoles apoyo logístico, médico y de manutención.

gg) Designado en 1982 como País Patrocinador del Terrorismo, no había pruebas para el 2010 de que Cuba hubiese cortado los vínculos con elementos de las Fuerzas Armadas Revolucionarias de Colombia (FARC).

16

**CERTIFIED TRANSLATION**
**PREPARED BY**
**SEVEN LANGUAGES, INC.**

hh) A miembros de las Fuerzas Armadas Revolucionarias de Colombia (FARC) se les permitió refugio seguro en Cuba y un salvoconducto a través de la isla.

## ACTOS DE TERRORISMO INTERNACIONAL

43.     Los actos de las FARC de disparar intencionalmente al avión de civiles estadounidenses para derribarlo constituyen un acto de "sabotaje aéreo", de conformidad con el título 28, sección 1605A(h)(1) del Código de los Estados Unidos de América.

44.     Los actos de las FARC de detener y secuestrar a los Demandantes, y de amenazarlos constantemente con asesinarlos, hacerles daño o mantenerlos en cautiverio, a objeto de obligar a los gobiernos de Colombia y de EE. UU. para que liberaran prisioneros, o se abstuvieran de una acción adicional constituyen un acto de "toma de rehenes", en virtud del título 28, sección 1605A(h)(2) del Código de los Estados Unidos de América.

45.     El asesinato de Tom Janis por parte de las FARC, y el encadenamiento por el cuello, las marchas forzadas por la selva, el cautiverio, así como otros actos de crueldad física y mental perpetrados contra los Demandantes secuestrados, constituyen actos de "ejecución extrajudicial" o de "tortura", según el título 28, sección 1605A(h)(7) del Código de los Estados Unidos de América.

## RESPONSABILIDAD LEGAL DE CUBA

46.     Este Tribunal tiene jurisdicción sobre el objeto de la presente acción en virtud de la Ley de Inmunidades a Soberanías Extranjeras ("FSIA", por sus siglas en inglés), la cual es la única base para obtener jurisdicción sobre un estado extranjero.  Si bien un estado extranjero es por lo general inmune a la jurisdicción de los tribunales estadounidenses, la FSIA establece ciertas excepciones. Cuando se cumplen los requisitos de una de esas excepciones y se notifica adecuadamente a ese estado extranjero, la FSIA proporciona jurisdicción tanto sobre el objeto de la acción, como sobre el estado extranjero (sujeto).

17

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

47.     El Congreso ha promulgado una excepción completa a la FSIA, para casos de terrorismo, que tiene como objeto eliminar la inmunidad del estado extranjero y proporcionar a las víctimas de terrorismo con una causal de demanda en casos que supongan cierto tipo de países patrocinadores del terrorismo.  La excepción por terrorismo ahora está codificada en el título 28, sección 1605A del Código de los Estados Unidos de América.

48.     La República de Cuba no está inmune a la jurisdicción de los tribunales estadounidenses debido a que por la presente acción los Demandantes buscan daños y perjuicios monetarios por lesiones personales o muerte ocasionadas por un acto de tortura, ejecución extrajudicial, toma de rehenes o por el suministro de apoyo material o de recursos para tales actos por parte de un funcionario, empleado o agente de tal estado extranjero mientras realiza funciones dentro del alcance de su oficina, empleo o agencia.  Título 28, sección 1605A(a)(1) del Código de los Estados Unidos de América.

49.     El título 28, sección 1605A(a)(2) del Código de los Estados Unidos de América contempla:

> (c), Derecho privado de acción .— Un estado extranjero que es o fue un estado patrocinador del terrorismo según se describe en la subsección (a)(2)(A)(i), … será responsable ante—
>
> (1) un ciudadano estadounidense,
> *          *        *
> (3) un empleado del gobierno de los EE. UU., o un individuo que esté ejecutando un contrato suscrito con el gobierno estadounidense, y que actúe dentro del alcance de su empleo, o
> (4) el representante legal de una persona descrita en los párrafos (1), (2), o (3),
>
> por lesiones personales o muerte ocasionadas por los actos descritos en la subsección (a)(1) de ese estado extranjero, o de un funcionario, empleado o agente de ese estado extranjero, para los cuales los tribunales de los Estados Unidos de América pueden mantener jurisdicción conforme a esta sección por daños y perjuicios monetarios. En tal acción, los daños y perjuicios pueden incluir daños económicos, emocionales, por dolor y sufrimiento y daños punitivos. En tal acción, un estado extranjero será responsable de forma indirecta por los actos de sus funcionarios, empleados o agentes.

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

50.     Cuba fue designada como país patrocinador del terrorismo en el momento en que ocurrieron todos los actos de terrorismo internacional objeto de esta acción, incluyendo la ejecución extrajudicial de Tom Janis perpetrada el 13 de febrero de 2003, y la toma de rehenes y tortura de Keith Stansell, Marc Gonsalves y Thomas Howes, quienes continuaron secuestrados hasta su rescate el 2 de julio de 2008.  Cuba además seguía estando designada como estado patrocinador del terrorismo durante el periodo de 6 meses previo a la presentación de esta acción.

51.     Los Demandantes son todos ciudadanos estadounidenses, y al momento de los actos terroristas todas las cuatro víctimas eran también empleados de una filial de Northrup Grumman, quienes ejecutaban un contrato suscrito con el gobierno estadounidense que contemplaba actividades de vigilancia antinarcóticos y actuaban dentro del alcance de las funciones de su empleo.

52.     Todos los Demandantes han sufrido daños por lesiones personales o por muerte a causa de los actos de las FARC de sabotaje aéreo, ejecución extrajudicial y toma de rehenes, y que también fueron ocasionados por décadas de apoyo material y recursos que Cuba proporcionó a las FARC a través de funcionarios, empleados o agentes cubanos, dentro del alcance de su oficina, empleo o agencia.

**CERTIFIED TRANSLATION**
**PREPARED BY**
**SEVEN LANGUAGES, INC.**

**LAS DÉCADAS DE APOYO MATERIAL Y DE RECURSOS PROPORCIONADOS POR
CUBA A LAS FARC ESTÁN CONECTADOS DE MANERA RAZONABLE
<u>CON LOS ACTOS TERRORISTAS QUE LAS FARC PERPETRARON CONTRA LOS
DEMANDANTES</u>**

53.     Los hallazgos del gobierno estadounidense con relación al patrocinio del terrorismo, y el apoyo

de Cuba al terrorismo hasta, e incluso, el momento del asesinato, tortura y secuestro de los

Demandantes, incluyen los siguientes hallazgos:

- Estado Patrocinador del Terrorismo:  En sus distintas formas - suministro de un
  santuario, entrenamiento, apoyo financiero, armas y explosivos, así como promoción
  diplomática y ayuda - **el patrocinio del estado contribuye significativamente con las
  capacidades de los grupos terroristas internacionales y les permite operar en un
  vasto rango geográfico**.  Algunos estados, aunque no patrocinen organizaciones
  terroristas contribuyen con las capacidades de los grupos, al brindarle facilidades de
  tránsito sin impedimentos o al permitirles participar en actividades comerciales.  La
  asignación de responsabilidades por incidentes de terrorismo patrocinados por países
  resulta difícil debido a que los países en cuestión ocultan su participación.

- **El suministro de fondos, refugio seguro, así como de armamento y apoyo logístico
  a terroristas por parte de estados soberanos es crucial para el funcionamiento de
  muchas organizaciones terroristas internacionales.**

- Los estados patrocinadores del terrorismo proporcionan un apoyo fundamental a grupos
  terroristas externos. **Sin el patrocinio de estos países, los grupos terroristas tendrían
  mucha mayor dificultad en obtener los fondos, armas, materiales y zonas seguras
  que requieren para planificar y llevar a cabo sus operaciones**.

54.     Los Demandantes no tienen que demostrar que el apoyo material y los recursos que durante

décadas ha brindado Cuba a las FARC contribuyeron directamente con cualquiera de los actos de

terrorismo específicos cometidos por las FARC.  Los Demandantes deben demostrar solo la

causalidad.

55.     El apoyo material y los recursos que durante décadas ha brindado Cuba a las FARC, según han

documentado oficialmente los Estados Unidos de América, entre otros el suministro de armas,

entrenamiento militar especializado, apoyo financiero, atención y tratamiento médico, refugio seguro,

20

**CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.**

salvoconductos, documentación, asesoramiento, comunicaciones, propaganda, apoyo logístico

brindado a las FARC y suministro de instalaciones seguras de transbordo para la distribución mundial

de cocaína de las FARC, sin duda:

a) permitieron que las FARC no hayan sido derrotadas por las fuerzas armadas colombianas, que de lo contrario habrían asesinado o capturado a los terroristas perpetradores de las FARC mucho antes del 13 de febrero de 2003, cuando Tom Janis fue asesinado;

b) permitieron que las FARC consiguieran armas, entre otras las AK-47 soviéticas y otras armas de alto calibre, que fueron usadas para derribar el Cessna de los Demandantes el 13 de febrero de 2003, que luego asesinaran a Tom Janis y amenazaran a los rehenes durante los 1.967 días de cautiverio por múltiples frentes de las FARC;

c) permitieron que las FARC consiguieran cadenas, cercados, alambres de púas, radios, así como otros equipos y suministros que fueron utilizados finalmente en 2003 y 2008 contra los Demandantes;

d) permitieron que las FARC obtuvieran alimentos, ropa y salarios para sus miembros, posibilitando así que las FARC continuaran operando a lo largo de los años hasta, e incluso, el periodo de 2003 a 2008.

e) permitieron que las FARC continuaran con su práctica de larga data de forzar a niños y niñas a que se unieran a la organización bajo amenaza de asesinar a sus padres o hermanos, con una generación de reclutados a la fuerza que continuaron en servicio para perpetrar los actos terroristas sobre los Demandantes del 2003 al 2008;

f) permitieron que las FARC mantuvieran su control psicológico mediante propaganda y tácticas intimidatorias enseñadas en Cuba, incluyendo la amenaza siempre presente de las FARC de asesinar a cualquier miembro de la organización que intentara desmovilizar o deponer las armas para reincorporarse a la sociedad colombiana;

g) evitaron que los miembros de las FARC hubiesen desertado mucho antes de cometer los actos terroristas contra los Demandantes;

h) permitieron que las FARC obtuviesen suministros médicos, atención y tratamiento médico de médicos cubanos en Venezuela, en consecuencia reforzando las FARC todos los años y prolongando su inminente derrota a manos de la milicia colombiana;

i) alentaron y envalentonaron a las FARC a que derribaran el avión civil estadounidense después de que vieran al estado cubano patrocinador [del terrorismo] hacer lo mismo en 1996 al avión civil de Hermanos al Rescate;

21

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

j) permitieron que las FARC mantuvieran el control de grandes secciones de territorio colombiano, incluyendo la región fronteriza con Venezuela, por donde caminaron temporalmente los Demandantes para evitar la milicia colombiana, y de las zonas donde el avión fue derribado, donde fue asesinado Tom Janis y por donde marcharon, fueron torturados y mantenidos en cautiverio los rehenes;

k) permitieron que las FARC se reagruparan y se recuperaran de las operaciones de combate de las fuerzas armadas colombianas previas a 2003, prolongando en consecuencia su capacidad de cometer los actos terroristas sobre los Demandantes de 2003 a 2008;

l) contribuyeron sustancialmente a la capacidad de las FARC de mantener y secuestrar de manera continua a rehenes estadounidenses durante un periodo de cinco años sobre zonas geográficas extensas de Colombia y Venezuela;

m) permitieron que las FARC expandieran su distribución de cocaína alrededor del mundo, sin ser detectados y de utilizar tales ingresos para entrenar, reclutar, organizar, comandar y controlar a miembros de las FARC que cometieron los actos terroristas sobre los Demandantes; y

n) facilitaron la canalización de dinero de Cuba a las FARC para que esta organización lo utilizara en sus operaciones terroristas, entre ellas la toma de rehenes y las ejecuciones extrajudiciales.

56. El apoyo material y los recursos que Cuba proporcionó a las FARC durante más de cuatro décadas está vinculado de manera razonable con el secuestro, tortura y asesinato a que estuvieron sometidos los Demandantes.

57. Las consecuencias del apoyo material y los recursos que Cuba proporcionó a las FARC por décadas son razonablemente ciertas y muy probablemente, incluyeron actos terroristas contra ciudadanos estadounidenses tales como el sabotaje del avión y la ejecución extrajudicial de Tom Janis que llevara a cabo la organización el 13 de febrero de 2003, y el posterior secuestro y tortura de los Demandantes.

**POR LO TANTO**, los Demandantes exigen justicia en su favor contra la Demandada REPÚBLICA DE CUBA según se describe a continuación:

22

**CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.**

KEITH STANSELL, por sus 1.967 días de cautiverio como rehén, y por la tortura mental y física a que estuvo sometido durante ese tiempo, incluyendo el dolor y sufrimiento mental y físico pasado y futuro, discapacidad, desfiguración, lesiones permanentes y pérdida del disfrute de la vida;

MARC GONSALVES, por sus 1.967 días de cautiverio como rehén, y por su tortura mental y física durante su cautiverio, incluyendo el dolor y sufrimiento mental y físico pasado y futuro, discapacidad, desfiguración, lesiones permanentes y pérdida del disfrute de la vida;

THOMAS HOWES, por sus 1.967 días de cautiverio como rehén, y por la tortura mental y física a que estuvo sometido durante su cautiverio, incluyendo el dolor y sufrimiento mental y físico pasado y futuro, discapacidad, desfiguración, lesiones permanentes y pérdida del disfrute de la vida;

JUDITH JANIS, como el cónyuge supérstite de Thomas Janis, fallecido: por los daños morales pasados y futuros, angustia mental, duelo, sufrimiento, desaparición física de su cónyuge, pérdida de confort, afectos y orientación;

CHRISTOPHER JANIS, como el hijo supérstite de Thomas Janis, fallecido: por los daños morales pasados y futuros, angustia mental, duelo, sufrimiento, desaparición física de su padre, pérdida de confort, afectos y orientación;

MICHAEL JANIS, como el hijo supérstite de Thomas Janis, fallecido: por los daños morales pasados y futuros, angustia mental, duelo, sufrimiento, desaparición física de su padre, pérdida de confort, de afectos y de orientación;

GREER JANIS, como la hija supérstite de Thomas Janis, fallecido: por los daños morales pasados y futuros, angustia mental, duelo, sufrimiento, desaparición física de su padre, pérdida de confort, de afectos y de orientación;

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

JONATHAN JANIS, como el hijo supérstite de Thomas Janis, fallecido:  por los daños morales pasados y futuros, angustia mental, duelo, sufrimiento, desaparición física de su padre, pérdida de confort, de afectos y de orientación;

CON FECHA: 14 de septiembre de 2015

/firmado/ Newt Porter
NEWTON P. PORTER
Abogado Litigante
(Colegio de abogados de Florida No. 833738)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
N.° de teléfono: (305) 373-5040
Número de fax: (305) 668-9154
Abogados de la parte demandante

/firmado/ Tony Korvick
TONY KORVICK
Abogado Litigante
(Colegio de abogados de Florida No. 768405)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
N.° de teléfono: (305) 373-5040
N.° de fax: (305) 668 -9154
Abogados de la parte demandante

24

CERTIFIED TRANSLATION
PREPARED BY
SEVEN LANGUAGES, INC.

# SEVEN LANGUAGES TRANSLATING SERVICES, INC.

## T R A N S L A T O R S  •  I N T E R P R E T E R S

Conferences • Depositions • Documents • Translations • Legal • Commercial • Medical • Technical • U.S. Court Certified Interpreters
Web site: www.sevenlanguages.com • info@sevenlanguages.com

### CERTIFICATE OF TRANSLATION

STATE OF FLORIDA           }
                           }
COUNTY OF MIAMI-DADE   }

BEFORE ME, on this day, personally appeared JOSEPH RICHARD PEREZ on behalf of

SEVEN LANGUAGES TRANSLATING SERVICES, INC., who being duly sworn,

deposes and says that he is fully versed in both the SPANISH and ENGLISH languages,

that he is a Federal Court certified interpreter in English and Spanish and that he is a

qualified and experienced translator from each of said languages to the other; and that to

the best of his knowledge and belief, the translation attached hereto consisting of

__24__   pages, is a true and accurate rendition of the original aforesaid and is the last

of the attached.

_____
JOSEPH RICHARD PEREZ

The foregoing instrument was acknowledged by me on this __11__ day of __September__,
20__15__. Joseph Richard Perez personally appeared before me at the time of notarization.  He is
personally known to me and produced a driver's license as identification and he did take an oath.

_____
Brittnie M. Sanchez, Notary Public
State of Florida at Large

**BRITTNIE M SANCHEZ**
MY COMMISSION #FF148523
EXPIRES August 6, 2018
(407) 398-0153   FloridaNotaryService.com

SPANISH
FRENCH
ITALIAN
HEBREW
CREOLE
DUTCH
PORTUGUESE
GERMAN
CHINESE
JAPANESE
RUSSIAN
SCANDINAVIAN
ASIAN
SLAVIC
& ALL OTHER
LANGUAGES

The utmost care has been taken to ensure the accuracy of all translations.  Seven Languages Translating Services and its
employees shall not be liable for any damages due to negligence or error in typing or translation.

OFFICES IN MIAMI • FT. LAUDERDALE • ORLANDO • TOKYO
19 W. FLAGLER ST. • SUITE 806 • MIAMI, FLORIDA 33130
DADE (305) 374-6761 • 24 HR. FAX (305) 374-0339 • 1-800-374-6761

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH STANSELL,                                    CASE NO.:
MARC GONSALVES,
THOMAS HOWES,
JUDITH JANIS,
CHRISTOPHER JANIS,
MICHAEL JANIS,
GREER JANIS, and
JONATHAN JANIS,

      Plaintiffs,

vs.

REPUBLIC OF CUBA,

      Defendant.

_____/

## **COMPLAINT**

Plaintiffs sue Defendant and allege:

## **THE ACTION, JURISDICTION & VENUE**

1.      This is a civil action for damages arising from Defendant providing over four decades of

material support and resources to the designated Foreign Terrorist Organization ("FTO")

REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC") and its members in support

of international terrorism.  Defendant support led to a series of acts of international terrorism

perpetrated by the FARC on Plaintiffs commencing on February 13, 2003 when Plaintiffs' aircraft

was shot down in Colombia.  Plaintiffs were U.S. national civilians flying a civilian FAA registered

aircraft conducting a contract DOD counter narcotics surveillance flight at the time their aircraft was

shot down.  After a successful crash landing, the pilot, THOMAS JANIS, was shot and killed by the

FARC.  The FARC imprisoned KEITH STANSELL, MARC GONSALVES and THOMAS

HOWES and held them hostage and tortured them in the Colombian and Venezuelan jungle for over 5 years until July 2, 2008 (1,967 days total captivity).

2.      This action is brought pursuant to the Foreign Sovereign Immunities Act's terrorism exception to the jurisdictional immunity of a foreign state, 28 U.S.C. §1605A.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1605A(a) and (c) because Plaintiffs are all U.S. nationals, and were civilians performing a counter-narcotics contract awarded by the U.S. government, and were subjected to acts of international terrorism, including torture, extrajudicial killing, hostage taking, and Cuba's provision of material support or resources contributed to causing these acts of international terrorism, while Cuba was designated as a state sponsor of terrorism, and was so designated within the 6-month period before this action was filed.

4.      Venue is proper in this district because of the substantial loss of solatium, mental anguish, bereavement, grief, loss of spousal and parental society, comfort and guidance, occurred and were sustained in this district by the survivors of TOM JANIS, deceased, and these damages give rise to this claim. 28 U.S.C. §1391(f)(1).

5.      This action is timely filed within 10 years of when the cause of action accrued upon the hostages rescue from their FARC captors, and the ensuing confirmation by the Janis family that it was in fact the FARC who had murdered Tom Janis. 28 U.S.C. §1605A(b).

## THE PLAINTIFFS

6.      Plaintiff KEITH STANSELL is a U.S. citizen residing in Florida.   Keith Stansell is a former United States Marine and was the mission commander for the February 13, 2003 counter narcotics flight.

2

7.     Plaintiff MARC GONSALVES is a U.S. citizen residing in Florida. Marc Gonsalves is an electronic surveillance systems specialist and was the chief counter narcotics analyst and collection officer on the February 13, 2003 flight.

8.     Plaintiff THOMAS HOWES is a U.S. citizen residing in Florida. Thomas Howes is a highly experienced pilot and was the second in command pilot on the February 13, 2003 flight.

9.     THOMAS JANIS was a citizen of the United States residing in Montgomery County, Alabama at the time the FARC murdered him on February 13, 2003. THOMAS JANIS was the pilot in command of the February 13, 2003 flight. THOMAS JANIS was a retired U.S. Army aviator and member of the U.S. Army's Special Operations Unit - Delta Force, who retired from the U.S. military after 32 years, and was the recipient of the Bronze Star and the Air Medal with Combat Distinguishing Device for Valor.

10.    Plaintiff, JUDITH JANIS, is a U.S. citizen and resident of Montgomery County, Alabama and is the surviving spouse of Thomas Janis.

11.    Plaintiff CHRISTOPHER JANIS is a U.S. citizen and the surviving son of Thomas Janis. Christopher Janis recently retired from active duty with the United States Army after serving multiple combat tours, and currently resides in this district in Dadeville, Tallapoosa County, Alabama.

12.    Plaintiff GREER JANIS is a U.S. citizen and the surviving daughter of Thomas Janis, and currently resides in Colorado.

13.    Plaintiff MICHAEL JANIS is a U.S. citizen and the surviving son of Thomas Janis. Michael Janis is currently on active duty with the United States Army serving a combat tour as an aviator in Afghanistan.

3

14.     Plaintiff, JONATHAN JANIS is a U.S. citizen and the surviving son of Thomas Janis, and currently resides in California.

## DEFENDANT

15.     The Republic of Cuba is a foreign state as defined in 28 U.S.C. §1603(a), and was a designated state sponsor of terrorism for approximately 33 years. Cuba has been a Communist regime since its inception, and has a long history of exporting Communism and sponsoring terrorism throughout Latin America, Europe and Africa.

16.     The Republic of Cuba was first added to the U.S. Department of State list of states sponsoring international terrorism in 1982, pursuant to Section 6(j) of the Export Administration Act of 1979 (P.L. 96-72) based upon Cuba's ties to international terrorism and its support for terrorist groups in Latin America.

17.     The "state sponsors of terrorism list" is mandated under Section 6(j) of the Export Administration Act of 1979, as amended (P.L. 96-72; 50 U.S.C. app. 2405(j)), under which the Secretary of State makes a determination when a country "has repeatedly provided support for acts of international terrorism."

18.     At all times material hereto, from the FARC's murder of TOM JANIS on February 13, 2003, and throughout the 1,967 days that the Plaintiff hostages were tortured and held captive until their rescue on July 2, 2008, the Republic of Cuba remained a U.S. designated state sponsor of terrorism.

19.     The Republic of Cuba was not removed from the state sponsors of terrorism list until May 29, 2015, less than 6 months prior to the date this action was filed.

20.     In 1996, Congress made the following official findings concerning the Cuban government:

4

- The Cuban Government engages in the illegal international narcotics trade and harbors fugitives from justice in the United States;

- The Castro government threatens international peace and security by engaging in acts of armed subversion and terrorism such as the training and supplying of groups dedicated to international violence; and

- For the past 36 years, the Cuban Government has posed and continues to pose a national security threat to the United States.

Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. §§6021-6091, Section 2, Findings.

21.     Cuba had fair warning and knew that its support of anti-American terrorist groups like the FARC could subject Cuba to the jurisdiction of the U.S. for civil liability.

22.     Cuba's decision to purposefully provide material support and resources to anti-American FTOs, like the FARC, and the fact that the Plaintiffs' injuries, captivity and death arose out of terrorist activities, enabled Cuba to "reasonably anticipate being haled into" a U.S. court.

23.     Cuba has purposefully directed support to the FTO FARC that targeted U.S. citizens and is therefore subject to the personal jurisdiction of this Court compatible with the notions of fair play and substantial justice.

## FARC's PURPOSEFUL DIRECTION OF TERROR & ACTIVITIES AT CITIZENS OF THE UNITED STATES

24.     In 1964, the FARC were established as the military wing of the Colombian Communist Party.

25.     On October 8, 1997 the Secretary of State of the United States, designated the FARC designated foreign terrorist organization (FTO), pursuant to Title 8, United States Code, Section 1189. The FARC was re-designated on September 5, 2001. At all times material to this action, the FARC is a designated foreign terrorist organization. Specifically, 8 U.S.C. § 1189(a)(1) authorizes

5

the Secretary of State to designate an organization as a foreign terrorist organization . . . if the

Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in

terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the

security of United States nationals or the national security of the United States. 8 U.S.C. §

1189(a)(1).

26.     The FARC is also a Specially Designated Global Terrorist ("SDGT") under IEEPA

Executive Order 13224.

27.     The FARC are terrorists who engage in international terrorism, including premeditated,

politically motivated violence, threats of violence, hostage takings, murders and other terrorist

related activities perpetrated against noncombatant targets including U.S. nationals.  The FARC

directs terrorist activities across national and international borders in order to influence U.S. and

Colombian policy.

28.     The FARC conspired to shoot down a U.S. aircraft, kidnap U.S. citizens, or kill them, and

to then hold them captive and broadcast their photographs worldwide for the express purpose of

inflicting terror on U.S. citizens and attempting to influence U.S. and Colombian government

policy.

29.     The FARC are strongly anti-American, have specifically targeted American citizens, and

have engaged in violent acts against Americans and Colombians.

30.     The FARC issued public statements in English and Spanish conveying anti-American

views, marking Americans as targets, and condemning the policies of the United States.

31.     On February 13, 2003 plaintiffs were conducting a counter narcotics surveillance mission

in a U.S FAA registered aircraft when the FARC opened fire on the aircraft.  Post-crash

investigation revealed the FARC had hit the aircraft with heavy machine gun fire before it had crash landed.

32.     FARC members have admitted that the FARC had intentionally fired at the aircraft to shoot it down, and capture its crew, knowing that it was a U.S. aircraft and U.S. national crew on-board.

33.     All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located the downed plane.   The American pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members within minutes of the landing, and their bodies were left a short distance from the crashed plane. The other three American hostages, Keith Stansell, Marc Gonsalves, and Thomas Howes were seized by force, taken hostage, and marched into the jungle by FARC members, where they were held captive for 1,967 days until their rescue July 2, 2008.

34.     The decedent, Thomas Janis was a retired United States Army Special Operations pilot, having served his last tour of duty before retirement as a Chief Warrant Officer Five member and Commander of Fixed Wing elements for a Special Forces Operational Detachment.  Following his 1998 military retirement, Thomas Janis was employed as a civilian flying reconnaissance and surveillance missions in Colombia in support of the global war against terrorism and narcotics trafficking.

35.     About two months after the plane crash, on April 27, 2003, the FARC issued a public communique taking credit for seizing and holding the three Americans hostages.   In that public letter, published to the United States, the FARC offered to release approximately 250 high level Colombian citizens that it was then holding hostage, together with the three Americans captured on February 13, 2003, in exchange for certain political concessions from the Colombian

7

government and to illegally influence the policy of the U.S. The FARC demanded that the Colombian government carve out of its sovereign territory a demilitarized zone (DMZ), which would be used as a new base of operations for the FARC, and release hundreds of FARC terrorists currently held by the Colombian authorities, as a condition for the release of the three American hostages.

36.     In July 2003, FARC forced the Plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes to participate in a videotaped interview to prove that they were alive and being held by FARC. A FARC senior leader Mono Jojoy, told the plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes that the FARC Commander "has ordered us . . . to send a proof of life to your families." The Plaintiffs' families lived inside the United States. The "proof of life" was delivered to CBS News, an American media organization in New York and aired throughout the U.S.

37.     The FARC demanded, in a form of communication published in the U.S., the release of two convicted FARC terrorists in the U.S. or FARC would kill, injure, and continue to forcibly detain the plaintiffs.

38.     The FARC acts were intended to intimidate or coerce the Colombian and U.S. civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

39.     Cuba's provision of material support enabled the FARC to commit acts of international terrorism including the following acts of the FARC:

   a) targeted American persons and companies;

   b) engaged in 2 way radio communications to inform each other about the presence of the Plaintiffs' aircraft in the area of the FARC's Teofilo Forrero Mobile Column's area of operations;

8

c) obtained permission to attack the aircraft which FARC knew carried U.S. nationals;

d) attacked the aircraft using firearms and seized as hostages U.S. nationals once the aircraft had crash landed;

e) shot and killed a U.S. national  - pilot of the downed aircraft;

f) shot and killed a Colombian soldier who was part of the crew of the downed aircraft;

g) forced the plaintiffs away from the aircraft crash site using armed force and deadly force and took them hostage;

h) repeatedly transported the plaintiffs to remote areas away from the site of the hostage taking using armed force and deadly force, with their necks chained for long marches through dense jungle terrain;

i) detained the hostages under armed guard and threat of death at various locations in the jungle;

j) assigned specific FARC members to execute plaintiffs in the event a rescue attempt was committed;

k) performed sadistic jungle medical procedures on plaintiffs when they were injured;

l) starved the plaintiffs for long periods;

m) chained the plaintiffs with truck chains;

n) demanded that the Colombian government create a demilitarized zone and conduct an exchange of prisoners with the FARC as explicit conditions for the release of the plaintiffs/hostages;

o) prepared and published forced proof of life videos which were aired in the United States;

p) named senior commanders, with expertise in negotiations to represent the FARC in negotiations with the Colombian government for the release of U.S. plaintiffs/hostages held by the FARC;

q) obtained false and fraudulent identification documents to facilitate participation in the negotiations of FARC demands for release of the U.S. plaintiffs/hostages;

r) concealed the location of the plaintiffs/hostages;

s) subjected the plaintiffs/hostages to cruel and inhumane conditions resulting in

9

disease, illness, mental and physical injury and trauma;

t)  denied the plaintiffs/hostages adequate food and medical care;

u)  solicited and received material support from various persons and foreign companies doing business in Colombia, and other countries outside of Colombia, including payment of protection money, and supplies, transportation, logistics, medical care and treatment for FARC terrorists;

v)  solicited and received financial support from various foreign banks and non-bank financial institutions, money launderers, money changers, foreign citizens and persons of interest, non-governmental groups and charities, front companies including money laundering of proceeds of the FARC's criminal activities, and other banking and financial transaction services to support the FARC's ongoing hostage taking, captivity and narcotics trafficking activities;

w)  availed itself of the U.S. banking system through foreign banks, non-bank financial institutions, money changers and launderers, U.S. and foreign persons with foreign accounts or privileges to use clearing accounts to send, direct, divert, and disguise, financial support for terrorist activities, murder, hostage taking, support of hostages in captivity and the terrorist who guard the hostages, operate communications and shadow local governments, and establish logistics and supply lines for illegal activities, including narcotics trafficking.

## CUBA'S HISTORY OF MATERIAL SUPPORT AND RESOURCES TO TERRORISTS INCLUDING THE FARC

40.     28 U.S.C. §1605(h)(3) states that ""material support or resources" has the meaning given

that term in section 2339A of title 18, which further states:

> (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials

18 U.S.C. §2339A(b)(1).

41.     The United States government has made official annual factual findings on Cuba's support

of international terrorism, including those made in annual reports prepared by the United States

Central Intelligence Agency's National Foreign Assessment Center, the Department of State's

"Patterns in Global Terrorism", and its "Country Reports on Terrorism" these factual findings are

final agency action and are entitled to a greater degree of deference from the Court than under the

Chevron standard.

42.     The U.S. government's factual findings with respect to sponsorship of terrorism generally,

and Cuba's support of international terrorism up to and including the time of Plaintiffs' murder,

torture and captivity, include the following factual findings:

   a) In Latin America the USSR and Cuba appear to be pursuing a long-term
      coordinated campaign to establish sympathetic Latin American regimes.  The
      Cubans clearly support organizations and groups in Latin America that use
      terrorism as a basic technique to undermine existing regimes.

   b) Havana openly supports and advocates armed revolution as the only means for
      leftist forces to gain power in Latin America. Cuba also supports organizations
      and groups in Latin America that use terrorism to undermine existing regimes.
      The Cubans have played an important role in facilitating the movement of men
      and weapons into Central and South America, providing direct support in the
      form of training, arms, safe havens, and advice to a wide variety of guerrilla
      groups.

   c) In its efforts to promote armed revolution by leftist forces in Latin America, Cuba
      supports organizations and groups that use terrorism to undermine existing
      regimes. In cooperation with the Soviets, the Cubans have facilitated the
      movement of people and weapons into Central and South America and have
      directly provided funding, training, arms, safehaven, and advice to a wide variety
      of guerrilla groups and individual terrorists.

   d) Manuel Pineiro Losada, head of the America Department of the Central
      Committee of the Communist Party, reaffirmed Cuban commitment to the
      revolutionary process - **including support for groups that use terrorism** - at the
      1982 international theoretical conference. Pineiro stressed the fundamental
      Marxist-Leninist principle of the need "to destroy the repressive machinery of the
      state in order to achieve complete control and replace it with a new state." To this
      end **he identified the timely use of arms as indispensable** for the triumph of any
      liberating revolution.

   e) Cuba continued to assist terrorist insurgent organizations and other destabilizing
      elements in Latin America, Africa, the Middle East, and the United States.  Its

11

support has included training, funding, documentation, and guidance, as well as communications, propaganda, and logistic support. In addition, Cuba has actively promoted contact and cooperation among sometimes disparate or antagonistic groups.

f) The Castro regime maintains a large and complex subversion support apparatus that provides backing for all types of leftist revolutionaries and terrorists. This support includes everything from guns and funding to asylum and training in the entire range of skills needed by terrorists.

g) The Castro regime has maintained a large and complex apparatus for subversion that supports many leftist revolutionaries and terrorists. This has ranged from arms and funding to safehaven and training-assistance that is indispensable for guerrilla movements and terrorists in Latin America. Castro has given logistic assistance and financial support to thousands of guerrillas and has provided them with military training.

h) Cuba maintains a large and complex apparatus for subversion that has substantially assisted guerrilla movements and terrorists in Latin America. Cuba gives logistic assistance and financial support to thousands of regional subversives-mostly from Central America-and provides them with military training. Havana has close and longstanding relationships with terrorist groups in Chile and Colombia.

i) Havana has long encouraged efforts by Colombian insurgents to unite.

j) Colombia's main insurgent groups formed a new alliance, the Simon Bolivar Guerrilla Coordinator, under the leadership of the Revolutionary Armed Forces of Colombia. The coalition was established to provide a unified political and guerrilla front and we are concerned that it might be used to coordinate terrorist attacks against foreign interests.

k) Since 1959, Cuba has trained and supported guerrillas throughout the world, including Palestinians. Such training has become increasingly specialized. Cuba has provided safe haven, weapons, and political and financial support to a wide range of leftist and insurgent organizations that use terrorism in Latin America, including groups from El Salvador, Guatemala, Ecuador. Chile and Colombia.

l) For nearly 30 years now, the Cuban President Fidel Castro has trained and supported guerrillas from many parts of the world, including Palestinians, who have relied in part on terrorist operations against noncombatants to advance their political aims. Cuba has maintained a large and complex apparatus for subversion that has substantially assisted guerrilla movements throughout Latin America, and many of Latin America's radical leftist organizations look to Castro for guidance and advice. Havana has particularly longstanding ties to guerrilla groups in

12

Colombia. Because of such continuing involvement, the US Government in 1982 put Cuba on its official list of state supporters of terrorism. Cuba continues to provide safehaven, weapons, and political and financial support to a wide range of leftist and insurgent organizations that use terrorism.

m) In Colombia, Cuba provides some training to all major guerrilla groups, and an undetermined number of Colombians travel there each year for training.

n) Cuba continues to serve as a haven for regional revolutionaries and to provide military training, weapons, funds, and guidance to radical subversive groups that use terrorism. The island today remains a major training center and transit point for Latin subversives and some international groups. Several rebel organizations have offices and members stationed in Havana. Wounded rebels are often treated in Cuban hospitals. With the demise of the pro-Cuban governments in Panama and Nicaragua, Cuba's support has become even more important to radical groups.

o) Cuba continues to provide limited political training to some leftist organizations. We have no information to confirm that Cuba has closed down its training camps for armed insurgents.

p) Havana does provide safehaven for several international terrorists. Cuba has not renounced political support for groups that engage in international terrorism.

q) Colombia's two main guerrilla groups, the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), maintain representatives in Havana.

r) the Castro regime provided significant levels of military training, weapons, funding, and guidance to leftist extremists worldwide.

s) Cuba is still a safehaven for several international terrorists, maintains close relations with other state sponsors of terrorism, and remains in contact with numerous leftist insurgent groups in Latin America.

t) Cuba, nonetheless, continues to maintain close ties to other state sponsors of terrorism and leftist insurgent groups in Latin America. For instance, Colombia's two main terrorist groups, the FARC and the ELN, maintain representatives in Cuba. Moreover, Havana continues to provide safehaven to a number of international terrorists and US terrorist fugitives.

u) Colombia's two largest terrorist organizations, the Revolutionary Armed Forces of Colombia and the National Liberation Army (ELN), both maintained a permanent presence on the island.

13

v) The Cuban Government continued and provided some degree of safehaven and support to members of the Colombian FARC and ELN groups. A Cuban spokesman revealed that Sinn Fein's official representative for Cuba and Latin America, Niall Connolly, who was one of three Irish Republican Army members arrested in Colombia on suspicion of providing explosives training to the FARC, had been based in Cuba for five years.

w) In 2002, Cuba continued to host several terrorists and US fugitives. Havana provided some degree of safehaven and support to members of the Colombian Revolutionary Armed Forces of Colombia (FARC) and National Liberation Army (ELN) groups.

x) In 2003, Havana permitted up to 20 ETA members to reside in Cuba and provided some degree of safehaven and support to members of FARC and the ELN.

y) In 2004, Cuba continued to provide limited support to designated Foreign Terrorist Organizations, as well as safehaven for terrorists. Havana provided safehaven and some degree of support to members of the Colombian FARC and ELN guerilla groups.

z) The Government of Cuba maintains close relationships with other state sponsors of terrorism such as Iran and North Korea, and has provided safe haven to members of ETA, FARC, and the ELN.

aa) Cuba did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank.

bb) The Cuban government did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 Against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank.

cc) The Government of Cuba provided safe haven to members of ETA, the FARC, and the ELN. It maintained close relationships with other state sponsors of terrorism such as Iran and Syria.

dd) The Cuban government continued to provide safe haven to several terrorists. Members of ETA, the FARC, and the ELN remained in Cuba during 2008, Cuban authorities continued to publicly defend the FARC.

ee) The Government of Cuba continued to provide physical safe haven and ideological support to members of three terrorist organizations that are designated as Foreign Terrorist Organizations by the United States.

14

ff) The Government of Cuba has long assisted members of the Revolutionary Armed Forces of Colombia (FARC), and in 2009 continued to provide safe haven to members of the FARC, ELN, and ETA, providing them with living, logistical, and medical support.

gg) Designated as a State Sponsor of Terrorism in 1982, there was no evidence by 2010 that it had severed ties with elements from the Revolutionary Armed Forces of Colombia (FARC).

hh) Members of the Revolutionary Armed Forces of Colombia (FARC) were allowed safe haven in Cuba and safe passage through Cuba.

## THE ACTS OF INTERNATIONAL TERRORISM

43.    The FARC's acts of intentionally shooting at the U.S. civilian aircraft to bring it down constitutes an act of "aircraft sabotage" under 28 U.S.C. §1605A(h)(1).

44.    The FARC's acts of detaining the hostage Plaintiffs, and repeatedly threatening to kill, injure or continue to detain them, in order to compel the Colombian and U.S. governments to release prisoners, or abstain from further action, constitutes an act of "hostage taking" under 28 U.S.C. §1605A(h)(2).

45.    The FARC's murder of Tom Janis, and the neck chaining, forced jungle marches, captivity and other acts of physical and mental cruelty to the hostage Plaintiffs, constitute acts of "extrajudicial killing" or "torture" under 28 U.S.C. §1605A(h)(7)

## CUBA'S STATUTORY LIABILITY

46.    This Court has subject-matter jurisdiction over this case pursuant to the Foreign Sovereign Immunities Act ("FSIA"), which is the sole basis for obtaining jurisdiction over a foreign state. Although a foreign state is generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions. When the requirements of one of these exceptions are met and the foreign state is properly served, the FSIA provides both subject-matter jurisdiction over the action and personal jurisdiction over the foreign state.

47.    Congress has enacted a comprehensive terrorism exception to the FSIA that was meant to

waive sovereign immunity and provide terrorism victims with a cause of action in cases

involving certain types of state sponsored terrorism. This terrorism exception is now codified as

28 U.S.C. § 1605A.

48.    The Republic of Cuba is not immune from the jurisdiction of courts of the United States

because money damages are sought herein by Plaintiffs for personal injury or death that was

caused by an act of torture, extrajudicial killing, hostage taking, or the provision of material

support or resources for such an act by an official, employee, or agent of such foreign state while

acting within the scope of his or her office, employment, or agency.  28 U.S.C. §1605A(a)(1).

49.    28 U.S.C. 1605A(a)(2) provides:

> (c), Private Right of Action .— A foreign state that is or was a state sponsor of
> terrorism as described in subsection (a)(2)(A)(i), ... shall be liable to—
>
> (1) a national of the United States,
> *          *          *
> (3) an employee of the Government of the United States, or of an individual
> performing a contract awarded by the United States Government, acting within the
> scope of the employee's employment, or
> (4) the legal representative of a person described in paragraph (1), (2), or (3),
>
> for personal injury or death caused by acts described in subsection (a)(1) of that
> foreign state, or of an official, employee, or agent of that foreign state, for which
> the courts of the United States may maintain jurisdiction under this section for
> money damages. In any such action, damages may include economic damages,
> solatium, pain and suffering, and punitive damages. In any such action, a foreign
> state shall be vicariously liable for the acts of its officials, employees, or agents.

50.    Cuba was designated as a state sponsor of terrorism at the time all of the subject acts of

international terrorism occurred, including the February 13, 2003 extrajudicial killing of Tom Janis,

and the hostage taking and torture of Keith Stansell, Marc Gonsalves and Thomas Howes which

continued until their rescue from captivity on July 2, 2008. Cuba also remained a designated state sponsor of terrorism within the 6 month period before this action was filed.

51.    Plaintiffs are all U.S. nationals, and at the time of the terrorist acts all four victims were also employees of a Northrup Grumman subsidiary performing a counter-narcotics surveillance contract awarded by the United States Government, and were acting within the scope of their employment.

52.    Plaintiffs have all sustained damages for personal injury or death caused by the FARC's acts of aircraft sabotage, extrajudicial killing, torture, and hostage taking, and which were also caused by Cuba's decades of material support and resources to the FARC which were committed by Cuban officials, employees, or agents while acting within the scope of his or her office, employment, or agency.

### CUBA'S DECADES OF MATERIAL SUPPORT AND RESOURCES TO THE FARC IS REASONABLY CONNECTED TO THE FARC'S TERRORIST ACTS UPON PLAINTIFFS

53.    The U.S. government's factual findings with respect to sponsorship of terrorism, and Cuba's support of international terrorism up to and including the time of Plaintiffs' murder, torture and captivity, include the following factual findings:

- State-Sponsored Terrorism:  In its various forms - provision of sanctuary,  training, financial support, weapons and explosives, and diplomatic encouragement and assistance - **state sponsorship contributes significantly to the capabilities of international terrorist groups, and enables them to operate over a wide geographical range**.  Some states, although not direct sponsors of terrorist organizations contribute to the groups' capabilities by giving them unimpeded transit facilities or by permitting them to engage in trading enterprises.  Assigning responsibility for incidents of state-sponsored terrorism is difficult because the countries concerned mask their involvement.

- **The provision of funding, safehaven, and weapons and logistic support to terrorists by sovereign states is crucial to the operation of many international terrorist organizations**.

17

- State sponsors of terrorism provide critical support to non-state terrorist groups. **Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations.**

54.   Plaintiffs are not required to prove that Cuba's decades of material support and resources to the FARC contributed directly to any of the specific terrorist acts committed by the FARC.  Nor are Plaintiffs required to show any "but for" causation.

55.   Cuba's decades or material support and resources to the FARC, as officially documented by the United States, including provision of weapons, specialized military training, financial support, medical care and treatment, safe haven, safe passage, documentation, guidance, communications, propaganda, logistic support to the FARC, and provision of secure transshipment facilities for the global distribution of FARC cocaine,  has more likely than not:

a) enabled the FARC to avoid defeat by the Colombian military which would otherwise have killed or captured the FARC terrorist perpetrators long before February 13, 2003 when Tom Janis was murdered;

b) enabled the FARC to procure weapons, including Soviet AK-47s and other high caliber weapons, that were used to shoot down Plaintiffs' Cessna on February 13, 2003, then murder Tom Janis and threaten the hostages throughout their 1,967 days of captivity by multiple FARC fronts;

c) enabled the FARC to procure chains, fencing, barbed wire, radios, and other equipment and supplies that were ultimately used in 2003 to 2008 upon Plaintiffs;

d) enabled the FARC to procure food, clothing and salaries for its members, thereby enabling the FARC to continue operations throughout the years up to and including 2003 to 2008;

e) enabled the FARC to continue its long practice of forcing young boys and girls to join the FARC upon threat of murdering their parents or siblings, which generation of forced conscripts then continued in service to perpetrate the terrorist acts upon Plaintiffs from  2003 to 2008;

f) enabled the FARC to maintain its psychological control through propaganda and fear tactics taught by Cuba, including the FARC's ever present threat of killing any FARC members who attempted to demobilize or lay down arms to rejoin Colombian society;

18

g) prevented the FARC members who would otherwise have defected long before committing the terrorist acts upon Plaintiffs;

h) enabled the FARC to procure medical supplies, medical care and treatment from Cuban doctors in Venezuela, thereby reinforcing the FARC each and every year and prolonging their likely defeat by Colombian military;

i) encouraged and emboldened the FARC to shoot down a U.S. civilian aircraft after seeing its Cuban state sponsor do that exact thing in 1996 to a Brothers to the Rescue civilian plane;

j) enabled the FARC to maintain control of large sections of Colombia, including the Venezuelan border region where Plaintiffs were temporarily marched to avoid Colombian military, and the areas where the plane was shot down, Tom Janis was killed, and the hostages were marched and tortured and held hostage;

k) enabled the FARC to regroup and recover from sustained Colombian military combat operations prior to 2003, thereby prolonging their ability to commit the subject terrorist acts upon Plaintiffs from 2003 to 2008;

l) substantially contributed to the FARC's ability to maintain and continually sequester the American hostages over a five year period over vast geographical areas of Colombia and Venezuela;

m) enabled the FARC to expand its distribution of cocaine globally without detection and to use such profits to train, recruit, organize, command, and control the FARC members who committed the terrorist acts upon Plaintiffs'; and

n) facilitated the funneling of money from Cuba to the FARC for use in the FARC's terrorist operations, including hostage-taking and extrajudicial killing.

56.     Cuba's material support and resources provided to the FARC for over four decades is reasonably connected to the FARC's kidnapping, torture, and murder of Plaintiffs.

57.     The consequences of the decades of Cuba's material support and resources to the FARC were reasonably certain, and more likely than not, to include terrorist acts against U.S. nationals such as the FARC's aircraft sabotage and extrajudicial killing of Tom Janis on February 13, 2003, and the ensuing hostage taking and torture of Plaintiffs.

19

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant REPUBLIC OF CUBA as follows:

KEITH STANSELL, for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life;

MARC GONSALVES, for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life; and

THOMAS HOWES for his 1,967 days of captivity as a hostage, and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life.

JUDITH JANIS, as the surviving spouse of Thomas Janis, deceased: for her past and future loss of solatium, mental anguish, bereavement, grief, loss of spousal society, comfort, affections and guidance;

CHRISTOPHER JANIS as the surviving son of Thomas Janis, deceased: for his past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

MICHAEL JANIS as the surviving son of Thomas Janis, deceased: for his past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

GREER JANIS as the surviving daughter of Thomas Janis, deceased: for her past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

20

JONATHAN JANIS as the surviving son of Thomas Janis, deceased: for his past and future loss of solatium, mental anguish, bereavement, grief, loss of parental society, comfort, affections and guidance;

DATED: September 14, 2015

/s/ Newt Porter
NEWTON P. PORTER
Trial Counsel
(Florida Bar No. 833738)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Facsimile:      (305) 668-9154
Attorneys for Plaintiffs

/s/ Tony Korvick
TONY KORVICK
Trial Counsel
(Florida Bar No. 768405)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Facsimile:      (305) 668-9154
Attorneys for Plaintiffs