# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                        )

**KEITH STANSELL,** *et al.*        )

         )

     **Plaintiffs,**          )

         )

       **v.**              )       **Civil No. 15-cv-01519 (APM)**

         )

**REPUBLIC OF CUBA,**       )

         )

     **Defendant.**          )
_____ )

## MEMORANDUM OPINION

Three American citizens held hostage by a terrorist group and the family members of a fourth American citizen killed during the hostage-taking filed suit against the Republic of Cuba under the terrorism exception to the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1605A.   Plaintiffs allege that Cuba provided material support to the Fuerzas Armadas Revolucionarias de Colombia, a designated foreign terrorist organization commonly known as "the FARC," which made possible the FARC's shooting down of their aircraft, extrajudicial killing of Tom Janis, and the hostage-taking and torture of Keith Stansell, Marc Gonsalves, and Thomas Howes.   Stansell, Gonsalves, and Howes seek money damages for the pain and suffering they endured during their 1,967 days of captivity.   The widow and children of Tom Janis seek solatium damages for the emotional trauma of losing their husband and father.

Cuba has never entered an appearance in this action.   The Clerk of Court entered an order of default against Cuba, and Plaintiffs moved for an entry of default judgment.   After thorough consideration of the evidence and briefing presented, the court grants Plaintiffs' motion.

## I.      BACKGROUND

The court begins with a summary of the factual background leading up to the terrorist acts at issue, a description of those acts, and the procedural history of this case.  To do so, the court draws upon the allegations in the Complaint, affidavits from Plaintiffs, the sworn testimony of two expert witnesses, and the official Central Intelligence Agency and United States Department of State annual reports on state sponsorship of terrorism worldwide.  Additionally, the court takes judicial notice of the Stipulated Statement of Offense entered in *United States v. Herrera* and incorporates that statement as part of its findings of fact.[1]  *See* Stip. Stmt. of Offense in Supp. of Guilty Plea, *United States v. Herrera*, No. 10-cr-339-15 (D.D.C. 2014), ECF No. 64 [hereinafter Stmt. of Offense].

### A.      Cuba's State Sponsorship of Terrorism

The FARC is a designated foreign terrorist organization existing and operating primarily in the Republic of Colombia.  *See* 8 U.S.C. § 1189(a)(1); Pls.' Notice of Filing App'x Vol. I, ECF No. 16 [hereinafter Pls.' Ex. List I], U.S. DEP'T OF STATE, *Patterns of Global Terrorism: 2001* (May 2002), ECF No. 16-20, at 6.  The group's predominant goal is to overthrow the Colombian government.  Throughout its years of existence, the FARC has sought to destabilize the existing government through acts of violence, including murders, hostage takings, and bombings.  *See* Stmt. of Offense ¶ 2; Pls.' Ex. List I, U.S. DEP'T OF STATE, *Patterns of Global Terrorism: 1997*

---

[1] The court grants Plaintiffs' Motion to Take Judicial Notice as to the Stipulated Statement of Offense entered in *United States v. Herrera*.  *See* Pls.' Mot. to Take Judicial Notice, ECF No. 25; Stip. Stmt. of Offense in Supp. of Guilty Plea, *United States v. Herrera*, No. 10-cr-339-15 (D.D.C. 2014), ECF No. 64.  A court may take judicial notice of a fact not subject to reasonable dispute, either because it is "generally known" or can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  It is well established that a court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding," *Booth v. Fletcher*, 101 F.3d 676, 679 n.2 (D.C. Cir. 1938), and courts adjudicating FSIA claims often elect to do so, *see e.g.*, *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015).  In *United States v. Herrera*, this court oversaw the criminal prosecution of one of the terrorists responsible for the very acts of terrorism at issue here.  Accordingly, that case is one "interrelated" to the present civil litigation and the court will take judicial notice of the Stipulated Statement of Offense in making its findings of fact.  *See Roth*, 78 F. Supp. 3d at 387.

(Apr. 1998), ECF No. 16-16, at 4; Decl. of Expert Witness Pedro Roig, ECF No. 15 [hereinafter Roig Decl.], at 12.  In 1964, the FARC became inspired by the Cuban Revolution and sought assistance, advice, and support from the Cuban government.  Aff. of Expert Witness Luis Miguel Cote Gómez, ECF No. 14 [hereinafter Cote Aff.], ¶ 27.

Throughout the time period relevant to this lawsuit, Cuba was led by Fidel and Raul Castro. *Id.*  The Castro brothers exercised complete control over all matters of government, which made them, in effect, the Cuban government.  *Id.*  Consequently, the brothers' "decisions to provide support and resources to . . . the FARC and to destabilize democracies in Latin America were . . . decisions made . . . [by] the Cuban government and state."  *See id.*; Roig Decl. at 5.

Cuba supported the FARC in a number of ways.  For example, Cuba provided military, explosives, and weapons training to FARC members in camps organized in Venezuela.  Cote Aff. ¶ 31; Roig Decl. at 24.  Through their Cuban allies, the FARC also gained communications training and expertise in intelligence gathering techniques.  *See* Cote Aff. ¶ 30.  Havana served as a safe haven for FARC members.  *Id.* ¶ 28; Roig Decl. at 14–15.  Additionally, through its relationship with the Venezuelan government, Cuba facilitated the FARC's ability to move across the Colombian-Venezuelan border undetected, which made it easier not only for Cuban officials to provide resources and advice to the FARC, but also for FARC members to access international flights, engage in drug trafficking, and evade international efforts to thwart their operations.  Cote Aff. ¶¶ 43, 47; Roig Decl. at 16, 19–20, 25.

### B.    The Events of February 13, 2003, and Subsequent Years of Captivity and Torture

On February 13, 2003, an aircraft performing a counter-narcotics surveillance flight over Colombia on behalf of the United States Embassy came under fire from the FARC and experienced engine failure.  On board were four American civilian contractors—Tom Janis, Keith Stansell,

Marc Gonsalves, and Thomas Howes—and one Colombian citizen, Luis Alcides Cruz. All five passengers survived the crash landing. Shortly thereafter, FARC members surrounded the aircraft and took the men hostage, separating Stansell, Howes, and Gonsalves from Janis and Cruz. The terrorists marched the first group of men into the jungle, where they would be held captive and tortured for more than five years. Janis and Cruz were shot, execution-style, and their bodies left near the crash site. *See* Stmt. of Offense ¶¶ 6–7, 8–12, 15; Cote Aff. ¶¶ 20, 44, 45(a)–(b); Pls.' Notice of Filing App'x Vol. II, ECF No. 17 [hereinafter Pls.' Ex. List II], Ex. 1, Aff. of Keith Stansell, ECF No. 17-1 [hereinafter Stansell Aff.], ¶¶ 2, 10; Pls.' Ex. List II, Ex. 2, Aff. of Marc Gonsalves, ECF No. 17-2 [hereinafter Gonsalves Aff.], ¶¶ 2, 9; Pls.' Ex. List II, Ex. 3, Aff. of Thomas Howes, ECF No. 17-3 [hereinafter Howes Aff.], ¶¶ 2, 10.

Members of the FARC informed the hostages that their continued detention would increase international pressure and allow the FARC to leverage concessions from the Colombian government in exchange for their release. Stmt. of Offense ¶ 10. In late July 2003, the FARC sent a videotape of the hostages to media outlets in the United States to prove the hostages were still alive. On the video, the FARC demanded that, in exchange for the release of the American hostages, Colombia release all FARC members held in Colombian prisons and create a demilitarized zone for the FARC. *Id.* ¶ 11.

During their time with the FARC, Stansell, Gonsalves, and Howes experienced extraordinarily cruel and dehumanizing treatment. The terrorists forced their hostages to march for miles in the jungle without the benefit of proper equipment or rest, going to great lengths to conceal their location and the hostages' identities. The hostages lost substantial weight and the pads on the balls of their feet were worn to the bone as a result of carrying heavy weight on their back while trekking miles each day in rugged terrain without proper footwear. Stansell Aff. ¶¶ 4(i),

5; Gonsalves Aff. ¶¶ 4(i), 5; Howes Aff. ¶¶ 4(i), 5.  To control the hostages, the FARC used "choke harnesses, ropes, chains, padlocks, and wires to bind the [hostages'] necks and wrists."  Stmt. of Offense ¶ 15.  The terrorists then chained the hostages to trees or one another for months or even years at a time.  Stansell Aff. ¶ 4(vi), (x); Gonsalves Aff. ¶ 4(viii); Howes Aff. ¶ 4(ix).  The food the hostages received was rotten, tainted with gasoline, and stored in containers previously used to store agricultural chemicals.  Howes Aff. ¶ 11.

The hostages lived in traumatic and unsanitary conditions.  The FARC kept the men in tight enclosures—such as wooden boxes or barbed wire cages—without toilet facilities of any kind.  If one of the hostages needed to relieve himself, then he had to ask permission; the FARC members often humiliated him for asking or denied permission altogether.  The men regularly were forced to defecate where they were chained, causing the enclosures to become covered in feces.  Stansell Aff. ¶ 4(xii); Gonsalves Aff. ¶¶ 4(vii)–(viii); Howes Aff. ¶ 4(iii).

Stansell, Gonsalves, and Howes each suffered from a plethora of debilitating illnesses.  For example, on four different occasions, Howes suffered from fly larva growing under his skin that had to be killed by cigarette nicotine and squeezed from his flesh.  Howes Aff. ¶ 4(ii).  The water and food the men received were dirty, causing them regular digestive problems.  Gonsalves Aff. ¶ 4(ii); cf. Stansell Aff. ¶ 4(i); Howes Aff. ¶ 4(ii).  More seriously, Gonsalves and Howes developed a skin rotting disease called leishmaniasis.  Despite having the medication with which to treat the infection and seeing the men in great need, the FARC repeatedly denied them the medication.  Gonsalves Aff. ¶ 4(v); Howes Aff. ¶ 4(ii), (v).

The medical attention the hostages did receive sometimes caused more harm than good.  For example, Stansell's hip became infected as a result of receiving spoiled medicine, causing a baseball-sized cyst to grow, rot, and burst.  The FARC cut the cyst out of Stansell's hip using a

scalpel, without any anesthetic or other pain medication.  Stansell Aff. ¶ 4(iv).  Similarly, although Gonsalves ultimately received the leishmaniasis medication, the FARC re-used needles for his treatments, causing him to contract hepatitis.  Gonsalves Aff. ¶ 4(v).  In an effort to treat the hepatitis, the FARC injected Gonsalves, against his will, with a variety of unknown drugs that caused him additional pain and suffering.  *Id.*

FARC members also regularly punished their hostages.  Sometimes they added chains or padlocks to the already heavy chains the hostages wore.  Howes Aff. ¶ 4(ix).  They also starved the hostages while subjecting them to exhausting marches through the jungle.  Gonsalves Aff. ¶ 4(iv); Howes Aff. ¶ 4(iv).  In one instance in particular, after a fellow hostage escaped, the FARC punished Stansell, Gonsalves, and Howes by requiring them to stand in a small space filled with large drums of gasoline and sealed off by thick gauge black plastic, forcing them to inhale the gasoline fumes.  Gonsalves Aff. ¶ 4(viii).

In addition to harming the hostages physically, the terrorists also inflicted extreme mental pain and suffering.  They forced Stansell, Gonsalves, and Howes into solitary confinement and prohibited them from speaking with anyone for months on end, causing the men to grow hoarse from not using their vocal chords.  Stansell Aff. ¶ 4(v); Gonsalves Aff. ¶ 4(iii); Howes Aff. ¶ 6.  Although the hostages' families tried to contact them by sending messages through the United States Embassy, these messages were never delivered.  Stansell Aff. ¶ 6.  Additionally, despite having access to radios, the terrorists only permitted some of the men to listen periodically to hear messages from their families.  *See* Stansell Aff. ¶ 6; Howes Aff. ¶ 6; *cf.* Gonsalves Aff. ¶ 4(iii).  The FARC also kept the Americans segregated from others, further isolating them.  *See* Stansell Aff. ¶ 5.

Furthermore, each of the men can recount specific acts that haunt him.  Gonsalves recalls one time being forced to carry a fifty-five pound backpack across a fallen tree "bridge" at gunpoint; the bridge gave way while he was halfway across, causing him to fall more than four meters to the rocky bottom of a gully.  Gonsalves Aff. ¶ 4(i).  Despite suffering a concussion and being unable to move one arm, the FARC forced Gonsalves to continue to carry the backpack another 15 miles through the jungle the following day and for the next several months.  *Id.*  Stansell testified that, one night, while being held in a cage and hearing helicopters overhead, FARC members stood beside the cage and began discussing how to kill the hostages.  Hearing this, Stansell approached the terrorists and asked that the FARC members shoot them cleanly, rather than spray them with gunfire and cause painful, non-lethal wounds from which they would suffer while dying.  Stansell Aff. ¶ 4(xii).  Lastly, Howes remembers the terrorists threatening to kill not only the hostages, but also any civilian with whom they came in contact.  Consequently, he testified to the emotional horror of accidentally encountering a family of five in the jungle and then later learning that the FARC murdered them all.  *See* Howes Aff. ¶ 4(vii).

All three men lived in constant fear of death.  The FARC required at least one of its members to be physically near the hostages at all times, and the hostages were explicitly told that, in the event of a rescue attempt, the guard would shoot them.  Stansell, Gonsalves, and Howes often saw helicopters flying overhead and witnessed the guards prepare their guns and position themselves to fire upon the hostages.  On other occasions FARC members approached each hostage and directly threatened to kill him, sometimes even dry-firing a weapon to simulate an execution.  Stansell Aff. ¶ 4(ix); Gonsalves Aff. ¶ 4(vi); Howes Aff. ¶ 4(vi).

After 1,967 days in captivity, the men were rescued on July 2, 2008, by the Colombian military. Pls.' Ex. List I, Ex. 27, U.S. DEP'T OF STATE, *Patterns of International Terrorism 2008* (Apr. 2009), ECF No. 16-27 [hereinafter *Country Reports on Terrorism 2008*], at 2.

### C.     The Victims and the Claimants

Keith Stansell, Marc Gonsalves, and Thomas Howes, are all American citizens presently residing in Florida. Stansell is a former United States Marine and served as the mission commander on the February 13, 2003, counter-narcotics surveillance flight. Compl., ECF No. 2 [hereinafter Compl.], ¶ 6. Gonsalves is an electronic surveillance systems specialist and was the chief counter-narcotics analyst and collection officer on board. *Id.* ¶ 7. Howes is a highly experienced pilot and was second-in-command on the flight. *Id.* ¶ 8.

Tom Janis was an American citizen and, at the time of his death, a resident of Alabama. *Id.* ¶ 9. He was a retired United States Army aviator and spent 11 years as the Fixed Wing Commander of the U.S. Army's Delta Force. Janis was the pilot of the plane on which the FARC opened fire on February 13, 2003. At the time he died, Janis was in peak physical condition and had a routine of daily physical fitness. He left behind a spouse of more than 30 years, Judith Janis, and their four children—Christopher, Greer, Michael, and Jonathan. Pls.' Ex. List II, Ex. 4, Aff. of Judith Janis, ECF No. 17-4 [hereinafter Jud. Janis Aff.], ¶¶ 3, 5–7, 14; Compl. ¶ 10–14.

Judith Janis is an American citizen and resident of Alabama. Christopher Janis is an American citizen who recently retired from active duty with the United States Army and also resides in Alabama. Michael Janis is an American citizen currently on active duty with the United States Army, serving overseas in Afghanistan. Jonathan Janis, also an American citizen, resides in California. Compl. ¶¶ 10–11, 13–14. At the time this lawsuit was filed, Greer Janis was an American citizen residing in Colorado, but she is now deceased. Her mother, Judith Janis,

represents her estate in this lawsuit.  Suggest. of Death and Unopp'd Mot. to Subst. Proper Party, ECF No. 22 [hereinafter Mot. to Subst.]; Mot. to Subst., Death Certificate, ECF No. 22-1 [hereinafter G. Janis Death Certificate]; Mot. to Subst., Letters of Admin., ECF 22-2; *see Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1166 & n.2 (D.C. Cir. 2013) (permitting legal representative of a deceased petitioner to continue a suit under the FSIA terrorism exception on behalf of a deceased petitioner).

### D.     Injuries Sustained by the Victims and the Claimants

#### 1.     The Victims

Keith Stansell suffers from premature deterioration of the discs in his spine, sensitivity in his feet, and permanent pain in his right torso as a result of the long, forced marches he had to endure, at times with broken ribs.  He struggles with ongoing digestive problems, and he had to undergo months-long treatment for the flesh eating virus he contracted in the jungle.  His time with the FARC left him permanently disfigured.  The flesh eating virus scarred his neck, crotch, and legs, and the heavy chains he was forced to wear scarred his neck and shoulders.  He still has a knot under the skin on his right hip where a cyst burst and had to be excised.  Stansell's pain and suffering is not limited to physical ailments.  He mourns the time and life experiences the FARC stole from him—he missed the birth of his twin sons, many years of family memories and holidays, and time spent with loved ones.  Lastly, he continues to struggle emotionally with managing the psychological pain caused by his captivity and isolation.  Stansell Aff. ¶¶ 11–13.

Marc Gonsalves also experiences ongoing physical and emotional scars as a result of being held hostage.  He has physical pain in his knees, legs, back, and shoulders, as well as frequent migraines.  Gonsalves's short-term memory has been dramatically reduced, which affects his ability to perform day-to-day tasks.  In addition to insomnia and nightmares, Gonsalves suffers

from various "triggers"—often sounds or smells—that induce extreme anxiety and nervousness, as though he is once again being held captive. Helicopters, in particular, incite panic and make Gonsalves feel as though he is about to be killed. He cannot be in small spaces or amongst even moderate-sized groups of people indoors. Gonsalves's marriage failed as a result of his emotional instability, and he no longer lives with his children. He laments the time he could have spent with his children as they grew up and the active role he wishes he could have played in raising them. Gonsalves Aff. ¶¶ 10–12.

Thomas Howes, too, suffers physically and emotionally as a result of his time in captivity. He has lived for years with intestinal parasites, deteriorated eyesight, constant sore throat, esophageal erosion, leg cramps, and constant pain in his knees, ankles, and neck. Further, he finds himself consumed with stress, unable to stop worrying about how his experience in South America with the FARC will affect his relationships and professional career. The emotional trauma he suffered caused his marriage to fail, and he grieves the lost time with his family. Particularly painful for Howes was the passing of his father while he was being held by the FARC. Howes was very close with his father, and in addition to losing the opportunity to say goodbye to him, Howes is emotionally scarred by the fact that his father suffered in his last days from knowing his son was kidnapped. Howes Aff. ¶ 11–13.

### 2.    *The Claimants*

Tom and Judith Janis were married for more than 30 years, and Tom was "the love of [Judith's] life." Jud. Janis Aff. ¶ 8. The couple raised four children together, and Judith was proud to be Tom's wife, "knowing that no matter what life would bring [they] would get through it together." *Id.* ¶ 11. Although Tom traveled frequently for work in Colombia, the couple never spent more than 10 days apart. Judith frequently traveled to Colombia to visit Tom. On the day

Tom was murdered, Judith had been visiting; the couple kissed goodbye in the morning at the Colombian airport, and Judith boarded a commercial flight home to Alabama. *Id.* ¶ 10. Judith remembers his smile, their kiss, and Tom saying: "See you in 10 days honey girl." *Id.* Judith learned Tom's plane had crashed from two voicemails left on her answering machine while she was traveling that day. Thirty-six hours later, the president of Tom's company flew to Alabama to tell Judith in person that her husband had been killed. *Id.* ¶ 16. Judith spent years investigating the details of Tom's death. Only upon Stansell, Gonsalves, and Howes returning to the United States did Judith learn that the FARC had ordered Tom killed. *Id.* ¶ 17. Judith thinks of her late husband every day and continues to grieve his death, 13 years later. When she learned of Tom's passing, she "really didn't believe that life could go on," and today still feels "the other part of [her] is missing." *Id.* ¶ 16. Tom's absence is particularly pronounced on holidays, birthdays, and family gatherings. *Id.* ¶ 19. Judith has not remarried. *Id.* ¶¶ 3, 16.

Christopher Janis was 30 years old when his father was murdered. Pls.' Ex. List II, Ex. 5, Aff. of Christopher Janis, ECF No. 17-5 [hereinafter C. Janis Aff.], ¶¶ 2–3. He had a "close and loving relationship" with his father while growing up, and followed in Tom's footsteps by enlisting in the Army. *Id.* ¶¶ 4, 9. In addition to teaching Christopher to drive and to water ski, Tom shared a special relationship with his son over their parallel military service. *Id.* ¶¶ 4–6. Christopher's last memory of his father is from early 2003, when Tom drove Christopher to the assembly point for Christopher's deployment to Kuwait. Christopher remembers his father waving to him through the window of the truck, smiling. *Id.* ¶ 7. Christopher learned of his father's plane crash while in Kuwait, on February 14, 2003. While in the Atlanta International Airport, Christopher's wife told him his father had died. *See id.* ¶ 11. The news caused Christopher to immediately lose his breath, become weak in the knees, and break down crying. He still hates the Atlanta airport today because

of that memory.  *Id.*  Christopher's grief is continuous, particularly now that he has retired from the military.  *Id.* ¶ 13.  He was looking forward to talking with his father about their combat experiences and his feelings from his deployments.  *Id.* ¶ 10.  He tries to live his life in a manner of which his father would be proud, but feels his accomplishments are less rewarding without Tom here to enjoy them with him.  *Id.*

Greer Janis was 29 years old when Tom was murdered and she, too, shared a close and loving relationship with her father.  Greer could talk to her father about "anything" and often sought her father's advice.  Pls.' Ex. List II, Ex. 7, Aff. of Greer Janis, ECF No. 17-7 [hereinafter G. Janis Aff.], ¶¶ 3–4.  She visited home frequently because it was "a place of acceptance, tolerance, and love."  *Id.* ¶ 4.  Because Tom was murdered the day before Valentine's Day, Valentine's Day became a "dark day" for Greer, causing her annually to "relive the horror" of hearing her mother tell her that her father's plane had been out of contact with the radio tower.  *Id.* ¶ 6.  Each Valentine's Day, she "relive[d] the anxiety and trepidation of not knowing what had happened, and was happening, to [her] dad."  *Id.*  The first Christmas and New Year's Eve without Tom were difficult for Greer, particularly because New Year's Eve was her parents' wedding anniversary.  *See id.*  Greer thought of her father every day, and her grief and loss continued even 13 years after his murder.  *Id.* ¶ 9.  She wished she could share moments in her life with Tom or seek his advice.  *See id.*  Greer feels pain every day because her father "was ripped away from [her] and [her] family."  *Id.*  Tom was "an intrinsic part of [Greer's] life" and his death "made a hole in [her] life."  *Id.*  Greer died on July 26, 2016, at the age of 42.  *See* G. Janis Death Certificate; *cf.* G. Janis Aff. ¶ 3.

Michael Janis was 25 years old when Tom was murdered.  He, too, enjoyed a close and loving relationship with his father and, like Christopher, followed in his father's footsteps by

becoming an Army aviator.  He is currently on active duty with the United States Army.  Pls.' Ex. List II, Ex. 6, Aff. of Michael Janis, ECF No. 17-6 [hereinafter M. Janis Aff.], ¶¶ 3–4.  Michael describes Tom as not only a father, but also a "very close friend."  *Id.* ¶ 4.  He laments that they will not get to share any more father-son talks and wishes Tom could have been there to see his wings pinned on his uniform after graduating from flight school.  *See id.* ¶¶ 4–5.  Every Father's Day, Michael goes through a box of his father's things, feeling sad because Tom "had so much more life to live, so many more milestones, and moments with his children that [the family] [is] all missing."  *Id.* ¶ 6.  Michael learned of the plane crash from seeing headlines on the Internet, and his wife and he took turns scouring websites for updates.  Michael learned that his father had been killed when he heard his wife scream and saw CNN's website reporting that Tom's body had been found by the plane.  He remembers the strangeness of seeing CNN misreport his father's name as "Janis Thomas," rather than "Thomas Janis," and feeling "sick, confused, and scared for [his] mother."  *See id.* ¶ 8.  Because his mother was still traveling back from Colombia, Michael had to keep this information to himself for several hours, which was "utterly devastating."  *Id.* Although Michael "tries not to think of the worst moments of this tragedy," *id.*, he still finds it "next to impossible to choose to avoid the pain and emptiness his [father's] murder brought to [his] family," *id.* ¶ 4.  Tom's death has created a "darkness and emptiness" in his life.  Michael blames Tom's murder for his divorce from his high school sweetheart, and he wishes he and Tom could talk about serving overseas.  *Id.* ¶¶ 10, 11.  Michael has been unable to dream since Tom's murder and has not yet found peace with Tom's death, which "has been the most traumatic, painful, life-altering event [he] ha[s] ever experienced."  *Id.* ¶¶ 9, 12.

Jonathan Janis was 23 years old when his father was murdered.  Jonathan, like his siblings, enjoyed a close and loving relationship with Tom.  Pls.' Ex. List II, Ex. 8, Aff. of Jonathan Janis,

ECF No. 17-8 [hereinafter Jon. Janis Aff.], ¶¶ 1–2.  In addition to growing up with his father's help on homework and presence at school events, Jonathan enjoyed regular phone calls with his father as an adult.  *See id.* ¶¶ 3–4.  On their last Sunday phone call, Tom and Jonathan discussed their plans to have Tom and Judith visit Jonathan in Florida "for a Valentines week mini-vacation." *Id.* ¶ 4.  The news of Tom's plane having gone down was "unfathomable" to Jonathan, who told himself his father had to be fine because they had already booked hotel reservations and theme park tickets for the upcoming trip.  *See id.* ¶ 5.  Two days later, Jonathan learned from a resident assistant at Walt Disney World, where he was interning, that his father had been shot in the head and killed.  *Id.* ¶ 6.  During his father's funeral, Jonathan held his mother while she wept.  *Id.* Jonathan thinks of his father every day, and his grief and loss continues 13 years later.  *Id.* ¶ 7. Holidays—Thanksgiving, in particular—are difficult for Jonathan.  *See id.* ¶ 4.  For two years, he kept his father's cell phone number programmed in his cell phone, unwilling to delete the entry. *Id.* ¶ 7.  Jonathan wears his father's "watch and wedding band as a daily reminder" and is sad that he "no longer ha[s] [his] sounding board."  In particular, he misses his father's "motivational talks and tenderness."  *Id.*  Jonathan wishes his future children could have known their grandfather.  *See id.*  At one point in time, Tom and Jonathan had "toyed with the notion of a frame shop where [Jonathan would] do the matting and [Tom would] make the frame," which "will now never happen."  *Id.* ¶ 7.

### E.    Procedural History

Plaintiffs brought this lawsuit against the Republic of Cuba under 28 U.S.C. § 1605A(c), a federal statute that provides certain plaintiffs with a private cause of action against a foreign state whose sponsorship of terrorism causes the plaintiff personal injury or death.  Stansell, Gonsalves, and Howes seek damages for pain and suffering as a result of the acts of aircraft sabotage, hostage-

taking, and torture they endured at the hands of the FARC.  Judith Janis and her children seek solatium damages for the emotional trauma of losing their husband and father.

Plaintiffs filed their Complaint on September 17, 2015, and requested a summons be issued.  *See* Compl.; Req. for Summons to Issue, ECF No. 5.  After concluding service could not be effected, Plaintiffs asked the Clerk of Court to mail by DHL Express one copy of the summons, complaint, and notice of suit, together with a translation of each into Spanish, to the Minister of Foreign Affairs for the Republic of Cuba.  *See* Aff. Req'g Foreign Mailing, ECF No. 6; Req. for Clerk to Effect Service, ECF No. 9.

On September 22, 2015, Plaintiffs filed proof of service, reflecting that an individual in the Ministry of Foreign Affairs in Havana signed for the package sent by the Clerk of Court. *See* Return of Serv., ECF No. 11.  When Cuba failed to file an Answer to the Complaint within 60 days, the Clerk of Court filed an entry of default.  *See* Entry of Default as to the Republic of Cuba, ECF. No. 13 (dated Dec. 9, 2015); 28 U.S.C. § 1608(d); Fed. R. Civ. P. 55(a).  Plaintiffs then filed the Motion for Default Judgment presently before the court.  *See* Pls.' Mot. for Default J., ECF. No. 18.  The court invited the United States to file a Statement of Interest, but it declined to do so.  *See* Minute Order, dated June 20, 2016; Notice by United States of America, ECF No. 20; Notice by United States of America, ECF No. 32.[2]

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure grant district courts discretion to enter a default judgment upon a party's motion.  Fed. R. Civ. P. 55(b)(2).  Entering a default judgment is not a

---

[2] Although the court originally anticipated holding an evidentiary hearing, Plaintiffs asked the court to vacate it, asserting that such a hearing was not legally required and that they had submitted sufficient evidence, as part of their motion for default judgment, to satisfy their burden of proof.  The court agreed to vacate the evidentiary hearing. *See* Minute Order, dated Aug. 17, 2016; *see also Bluth v. Islamic Republic of Iran*, No. 12-cv-250, 2016 WL 4491760, at *10 (D.D.C. Aug. 25. 2016) (explaining that an evidentiary hearing is not required before a plaintiff may be awarded an entry of default judgment on a claim under the FSIA).

task the courts take lightly, or one to which the moving party is automatically entitled. *See Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 32 (D.D.C. 2016). Instead, "default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party," *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted), such as when one party "fail[s] to respond to the summons and complaint, the entry of default, or the motion for default judgment," *United States v. TXL Mortg. Corp.*, No. 15-cv-1658, 2016 WL 5108019, at *1 (D.D.C. Sept. 9, 2016) (internal quotation marks omitted).

Importantly, even when an entry of default judgment may be available, it is only warranted where the plaintiff satisfies his burden of proving the court has jurisdiction over the claims and the defendant and "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Thuneibat*, 167 F. Supp. 3d at 33. The FSIA does not specify what kinds of evidence the plaintiff must submit to meet this evidentiary burden; it "leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). The court must thoroughly review the plaintiff's allegations and the factual evidence presented, *Bluth v. Islamic Republic of Iran*, No. 12-cv-250, 2016 WL 4491760, at *10 (D.D.C. Aug. 25, 2016), rather than "unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). However, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33.

Therefore, an entry of default judgment is available and warranted when (1) the court has subject matter over the claims presented; (2) the court has personal jurisdiction over the

defendants; and the plaintiff presents sufficient evidence to satisfy the court (3) that she is entitled

to relief against the defendant (4) for the amount of damages requested.  *Id.*

## III.   DISCUSSION

A.      *Subject Matter Jurisdiction*

This court has original jurisdiction to hear suits brought against foreign states, irrespective

of the amount in controversy, if the case is a nonjury civil action for in personam relief and the

foreign state is not entitled to immunity under 28 U.S.C. §§ 1605–1607.  *See* 28 U.S.C. § 1330(a).

As a general matter, the FSIA insulates foreign states from being sued in American courts.

However, § 1605A—colloquially known as the "terrorism exception"—abrogates a foreign state's

sovereign immunity when the foreign state either perpetrated or provided material support or

resources for particular acts of terrorism resulting in personal injury or death.  *See* 28 U.S.C. §

1605A(a)(1).   A plaintiff relying upon this statutory provision to abrogate sovereign immunity

and, thus, establish subject matter jurisdiction, must prove four elements:

> (1) the foreign country was designated a state-sponsor of terrorism
> at the time of the act, (2) the claimant or the victim was a national
> of the United States at that time; (3) in a case in which the act
> occurred in the foreign state against which the claim has been
> brought, the claimant has afforded the foreign state a reasonable
> opportunity to arbitrate the claim; and (4) the plaintiff seeks
> monetary damages for personal injury or death caused by torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the
> provision of material support or resources for such an act, if engaged
> in by an official, employee, or agent of a foreign country.

*Thuneibat*, 167 F. Supp. 3d at 34 (citing 28 U.S.C. § 1605A(a)) (internal quotation marks omitted).

Here, Plaintiffs bring this civil suit against Cuba for in personam relief and do not request

a jury trial.  Compl. ¶ 1.  Accordingly, this court has jurisdiction over Plaintiffs' claims provided

Cuba cannot claim sovereign immunity.  *See* 28 U.S.C. § 1605(a)(1); *Thuneibat*, 167 F. Supp. 3d

at 34.  The court concludes that Plaintiffs have submitted sufficient evidence that Cuba's sovereign

immunity is abrogated by the FSIA terrorism exception and no other limitation bars the court from exercising subject matter jurisdiction over Plaintiffs' claims.

Cuba was first designated a state sponsor of terrorism in 1982, and the United States continuously maintained Cuba's status on that list until May 29, 2015.[3]  Therefore, Cuba was a state sponsor of terrorism for the entire period during which the FARC's terrorist acts against Plaintiffs occurred—February 13, 2003, to July 2, 2008.  *See* Roig Decl. at 4; Pls.' Ex. List I, Ex. 1, U.S. DEP'T OF STATE, *Patterns of International Terrorism: 1982* (Sept. 1983), ECF No. 16-1, at 2; Pls.' Ex. List I, Ex. 22, U.S. DEP'T OF STATE, *Patterns of Global Terrorism 2003* (Apr. 2004), ECF No. 16-22 [hereinafter *Patterns of Global Terrorism 2003*], at 2–3; Pls.' Ex. List I, Ex. 23, U.S. DEP'T OF STATE, *Country Reports on Terrorism 2004* (Apr. 2005), ECF No. 16-23 [hereinafter *Country Reports on Terrorism 2004*], at 2–3; Pls.' Ex. List I, Ex. 24, U.S. DEP'T OF STATE, *Country Reports on Terrorism 2005* (Apr. 2006), ECF No. 16-24 [hereinafter *Country Reports on Terrorism 2005*], at 5–7; Pls.' Ex. List I, Ex. 25, U.S. DEP'T OF STATE, *Country Reports on Terrorism* (Apr. 30, 2007), ECF No. 16-25 [hereinafter *Country Reports on Terrorism 2006*]; Pls.' Ex. List I, Ex. 26, U.S. DEP'T OF STATE, *Country Reports on Terrorism 2007* (Apr. 2008), ECF No. 16-26 [hereinafter *Country Reports on Terrorism 2007*], at 3–4; *Country Reports on Terrorism 2008*, at 4–5.

---

[3] Plaintiffs identify the date on which the United States removed Cuba from the list of countries it considers state sponsors of terrorism, but include no evidence to verify that fact.  However, the United States' reconciliation with Cuba was a widely publicized event, the date of which is well known in the general population.  *See, e.g.*, Julie Hirschfeld Davis, *U.S. Removes Cuba From State-Sponsored Terrorism List*, N.Y. TIMES (May 29, 2015), http://www.nytimes.com/2015/05/30/us/us-removes-cuba-from-state-terrorism-list.html; Carol Morello, *U.S. Takes Cuba Off List of State Sponsors of Terrorism*, WASH. POST. (May 29, 2015), https://www.washingtonpost.com/world/national-security/us-takes-cuba-off-list-of-state-sponsors-of-terrorism/2015/05/29/d718493a-0618-11e5-8bda-c7b4e9a8f7ac_story.html; Scott Neuman, *U.S. Drops Cuba From List of State Sponsors of Terrorism*, NPR (May 29, 2015), http://www.npr.org/sections/thetwo-way/2015/05/29/410543192/u-s-drops-cuba-from-state-sponsored-terrorism-list; Felicia Schwartz, *Cuba Officially Removed From U.S. State Sponsor of Terrorism List*, WALL ST. J. (May 29, 2015), http://www.wsj.com/articles/cuba-officially-removed-from-u-s-state-sponsor-of-terrorism-list-1432913160.

Accordingly, the court takes judicial notice of the fact that the United States took Cuba off its list of state sponsors of terrorism on May 29, 2015.  *See* Fed. R. Evid. 201(b), (c).

Additionally, all Plaintiffs in this action—both the victims and the claimants—are American citizens. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I); Stansell Aff. ¶ 1; Gonsalves Aff. ¶ 1; Howes Aff. ¶ 2; Jud. Janis Aff. ¶ 2; C. Janis Aff. ¶ 1; M. Janis Aff. ¶ 1; G. Janis Aff. ¶ 3; Jon. Janis Aff. ¶ 1.

Section 1605A(c)'s third requirement—that the defendant nation be provided an opportunity to arbitrate—does not apply here, as the acts of terrorism at issue did not occur in Cuba. *See* 28 U.S.C. § 1605A(a)(2)(A)(iii).

Lastly, Plaintiffs also presented satisfactory evidence to establish that their damages arise from Cuba's provision of material support and resources to the FARC, which committed aircraft sabotage, the extrajudicial killing of Janis, and the hostage-taking and torture of Stansell, Gonsalves, and Howes. *See id.* § 1605A(a)(1).

Under the FSIA, "aircraft sabotage" involves, in relevant part, "destroy[ing] an aircraft in service or caus[ing] damage to such an aircraft which renders it incapable of flight." *Id.* § 1605A(h)(1); Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, art. I, Sept. 23, 1971, 24 U.S.T. 565, 1973 WL 151803. The evidence Plaintiffs proffer reflects that members of the FARC shot at Plaintiffs' aircraft while it was in flight, causing it to crash-land. *See* Cote Aff. ¶¶ 20, 44, 45(a)–(b); Stansell Aff. ¶ 2; Gonsalves Aff. ¶ 2; Howes Aff. ¶ 2. These facts meet the definition of "aircraft sabotage" under § 1605A.

The evidence presented also satisfactorily shows that Tom Janis was the victim of an extrajudicial killing, and Stansell, Gonsalves, and Howes were the victims of torture. An "extrajudicial killing" is a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court," and an act of "torture" is "any act directed against an individual in the offender's custody or physical control, by which severe pain or suffering[,] . . . is

intentionally inflicted . . . for such purposes as obtaining . . . information or a confession, punishing that individual for an act that individual . . . has committed or is suspected of having committed, intimidating or coercing that individual, . . . or for any reason based on discrimination of any kind." 28 U.S.C. § 1605A(h)(7); Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3, 106 Stat. 73 (1992). Janis's execution in the jungle was not sanctioned by any court and plainly constitutes an "extrajudicial killing" within the meaning of the FSIA. *See* Jud. Janis Aff. ¶ 17; Stansell Aff. ¶ 10; Gonsalves Aff. ¶ 9; Howes Aff. ¶ 10; Cote Aff. ¶ 45(c); Stmt. of Offense ¶ 8. Similarly, the evidence reflects that the FARC "tortured" Stansell, Gonsalves, and Howes within the meaning of the FSIA by targeting them as Americans and, while holding them hostage, denying them food and necessary medical attention; forcing them to march for long periods while suffering illness and injury; confining them to a barbed wire cage for months; forcing them to breathe heavy gasoline fumes as a form of punishment; chaining them to one another and trees; preventing them from communicating for months at a time; repeatedly threatening them with death; performing mock executions; and preventing them from performing basic bodily functions with decency and privacy in order to humiliate and degrade them. *See* Stansell Aff. ¶¶ 3–6; Gonsalves Aff. ¶¶ 3–4; Howes Aff. ¶¶ 3–4.

Additionally, Plaintiffs' evidence shows Stansell, Gonsalves, and Howes were taken hostage within the meaning of the FSIA. "Hostage taking" is defined by federal and international law to mean "seiz[ing] or detain[ing] and threaten[ing] to kill, to injure, or to continue to detain another . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition [of the hostage's] . . . release." 28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages, art. I, T.I.A.S. No. 11081, 1983 WL 144724. The FARC's acts of surrounding the downed aircraft, detaining its passengers, and

separating and forcibly holding Stansell, Gonsalves, and Howes against their will for 1,967 days in order to leverage concessions from the Colombian and United States governments unquestionably constitutes "hostage-taking" under the FSIA. *See* Stmt. of Offense ¶ 16(e); Stansell Aff. ¶¶ 2–3; Gonsalves Aff. ¶¶ 2–3; Howes Aff. ¶¶ 2–3.

Finally, Plaintiffs' evidence proves to this court's satisfaction that Cuba provided material support and resources in furtherance of the FARC's actions. "Material support or resources" includes the provision of "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials." 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A. Plaintiffs' evidence shows that Cuba had a relationship with the FARC not only at the time the FARC shot down Plaintiff's aircraft, but also throughout the time the FARC held Stansell, Gonsalves, and Howes captive. At all times relevant to Plaintiffs' Complaint, the Cuban government provided, *inter alia*, safe haven for FARC members, political and military support for the FARC's trafficking of cocaine through Venezuela, weapons, financial support, military training, and expert advice on the production and trade of illicit drugs. Cuba also facilitated FARC members' travel through Venezuela and Cuba. *See* Roig Decl. at 14–16, 19–20, 23–25; Cote Aff. ¶¶ 7–8, 16, 23(f), 28–35, 43; *Patterns of Global Terrorism 2003* at 3; *Country Reports on Terrorism 2004* at 3; *Country Reports on Terrorism 2005* at 7; *Country Reports on Terrorism 2006*; *Country Reports on Terrorism 2007* at 3; *Country Reports on Terrorism 2008* at 4–5. This material support enabled the FARC to commit international acts of terrorism, including, but not limited to, facilitating their targeting of Americans; attacking the aircraft carrying Stansell, Gonsalves, Howes, and Janis;

21

killing Janis and holding Stansell, Gonsalves, and Howes hostage; moving the hostages throughout the jungle to avoid detection; guarding the hostages under threat of death; and keeping the hostages captive for more than five years.  *See* Cote Aff. ¶¶ 45–46, 49; Roig Decl. at 24–25.

The court also acknowledges that this action is timely.  Plaintiffs filed suit on September 17, 2015, which is within the six-month window after Cuba was relieved of its designation as a state sponsor of terrorism.  *See* 28 U.S.C. § 1605A(a)(2)(A)(I)(i).  Plaintiffs' suit also is within 10 years of the victims' rescue on July 2, 2008.  *See id.* § 1605A(b)(2).

Thus, the court is satisfied that it may exercise its subject matter jurisdiction.

### B.    Personal Jurisdiction

Personal jurisdiction over a foreign state exists if service is made pursuant to 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).  Section 1608 provides four means of effecting service on a foreign state:  (1) "by special arrangement for service between the plaintiff and the foreign state or political subdivision"; (2) "in accordance with an applicable international convention on service of judicial documents"; (3) if neither of the first two options is available, then by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned"; or (4) if the third option cannot effect service within thirty days, then by requesting that the clerk of the court send two copies of the aforementioned materials to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services," whereupon the Secretary will then send one copy of the papers "through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic notice indicating when the papers were transmitted."  28 U.S.C. § 1608(a).

Plaintiffs properly effected service on October 6, 2015, when they filed with the court proof that the Complaint, Summons, and Notice of Suit, together with a copy of each in Spanish, were served on the Minister of Foreign Affairs and signed for in Havana.  *See* Certificate of Mailing, ECF No. 10; Return of Service/Aff., ECF No. 11.  Service in accordance with § 1608(a)(3) was appropriate because, at the time Plaintiffs commenced suit, Cuba had neither a special arrangement for service with Plaintiffs nor entered into an international convention governing service.  *See* Pls.' Req. for Clerk to Effect Service, ECF No. 9.  Accordingly, Plaintiffs established that service was properly effected and the court is satisfied that it has personal jurisdiction over Cuba.

### C.     Cuba's Liability to Plaintiffs

Section 1605A(c) offers certain plaintiffs a federal cause of action against a foreign state that perpetrated or provided material support for an act of torture, extrajudicial killing, hostage taking, or aircraft sabotage, resulting in the plaintiff's personal injury or death.   28 U.S.C. § 1605A(c).  This cause of action has five elements: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act"; (2) committed or materially supported by the defendant foreign state or an official, employee, or agent of the defendant foreign state; (3) that "caused"; (4) "personal injury or death"; (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  *Id.*  §§ 1605A(a)(1), (c).  Additionally, the plaintiff must be an American citizen, a member of the armed forces, a government employee or individual performing a government contract and acting within the scope of that employment, or a legal representative thereof.  *Id.* § 1605A(c).  Lastly, the defendant foreign state has to be, have been at the time of the attack, or have been so designated as a result of the attack, a state sponsor of terrorism.  *Id.* §§ 1605A(a)(2)(A)(i), (c).

Although the statute sets out the private cause of action, it offers no substantive guidance as to what will satisfy the causation and injury elements of that cause of action.  As a result, courts rely on "generalized principles of tort law" to determine whether the defendant is legally responsible for the plaintiff's harm.  *See Thuneibat*, 167 F. Supp. 3d at 38; *cf. Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (explaining that, in FSIA state-sponsored terrorism exception cases, the federal courts must apply traditional tort principles from the Restatement and existing state law, rather than develop federal common law).

It is not enough for plaintiffs to "simply alleg[e] that an act 'caused harm.'"  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175 (D.D.C. 2010).  Instead, § 1605A(c) requires that plaintiffs establish causation not only as a matter of fact, but also as a matter of law.  *Id.* Therefore, plaintiffs seeking to recover damages under § 1605A(c) "must articulate the justification for . . . recovery, generally through the lens of civil tort liability." *Id.* at 176.  In other words, plaintiffs must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, battery—to properly raise a claim under § 1605A(c).

### 1.  *The Direct Victims—Stansell, Gonsalves, and Howes*

Stansell, Gonsalves, and Howes were American citizens at the time of the February 13, 2003, attack, and, as explained previously, Cuba was designated a state sponsor of terrorism for the entire period during which Stansell, Gonsalves, and Howes were held hostage and tortured.

In addition, the court has already concluded that Stansell, Gonsalves, and Howes suffered acts of aircraft sabotage, hostage taking, and torture—as those terms are understood under the FSIA—at the hands of the FARC, and the record evidence demonstrates that Cuba provided material support to the FARC.  Lastly, the court has determined it has jurisdiction over this matter

and Plaintiffs seek only monetary compensation.  *See supra* III.A.  Therefore, the first, second, and fifth elements of § 1605A(c) are satisfied.

With respect to causation and injury, Stansell, Gonsalves, and Howes specified no particular theory of relief to justify their receipt of damages—instead, each plaintiff seeks compensation for "the 1,967 days of captivity as a hostage and for his physical and mental torture during captivity, including past and future physical and mental pain and suffering, disability, disfigurement, permanent injuries, and lost enjoyment of life."  *See* Compl. (concluding prayer for relief).  This type of pleading is a "caused harm" pleading—for which this court has admonished plaintiffs.  *See Rimkus*, 750 F. Supp. 3d at 175, 183 (explaining that plaintiff failed to plead a theory of relief when he alleged only that his son died and defendants were responsible for his son's death).

Nonetheless, courts in this District previously have allowed a plaintiff's FSIA claim to proceed, even absent a clearly articulated theory of recovery, when the plaintiff alleged all the facts necessary to establish the elements of § 1605A(c).  *See, e.g., id.* at 176, 181–82; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 12–13 (D.D.C. 2010); *cf. Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 52 (D.D.C. 2012).  Here, the court is presented with all the facts necessary to establish causation and injury and, therefore, "will not exalt form over substance" to preclude relief.  *See Rimkus*, 750 F. Supp. 2d at 176.  Instead, the court will look to state decisional law, legal treatises, and the Restatements to identify an applicable theory of recovery in concert with the evidence presented.  *See id.* at 183–84; *Valencia*, 774 F. Supp. 2d at 12–13.

The language Stansell, Gonsalves, and Howes use in their Complaint and the evidence before the court largely align with the quintessential common law torts of battery (aircraft sabotage

and physical torture); false imprisonment (hostage taking); and assault and intentional infliction of emotional distress (mental and emotional harm). *Cf. Valencia*, 774 F. Supp. 2d at 13.

With respect to the acts of aircraft sabotage and physical torture, Stansell, Gonsalves, and Howes may recover under a theory of battery. Battery occurs when one person (1) "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and (2) a harmful contact with the person of the other directly or indirectly results." *See* RESTATEMENT (SECOND) OF TORTS § 13; *Valencia*, 774 F. Supp. 3d at 13; *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 48 (D.D.C. 2001) (describing physical torture as an extreme form of battery). "Harmful contact" is that which causes "any physical impairment of the condition of another's body, or physical pain or illness," *see* RESTATEMENT (SECOND) OF TORTS § 15, and can be caused by contacting either another's person directly or an instrumentality that acts as an extension of the individual's person, such as a car or airplane in which the individual is traveling, *see id.* § 18 cmt. c & Rptr.'s Notes.

Here, a battery occurred both when the FARC shot down the airplane and when the terrorists subsequently tortured their hostages. The FARC's act of shooting down a moving aircraft was an intentional harmful contact to those onboard. Similarly, the acts of physical torture—e.g., chaining the hostages to one another and to trees, forcing them to breathe gasoline fumes, imposing unwanted medical treatment on them—were direct, intentional, harmful contacts. The hostages suffered physical injuries from the plane crash, disfigurement from the chains, and continue to suffer from the effects of the FARC's forced medical treatments. *See supra* I.D.

In light of the evidence presented, the court has little trouble concluding that Cuba provided the FARC with the materials, training, and resources necessary to carry out these batteries—the aircraft sabotage and physical torture—and that it did so with intent to harm these plaintiffs. Cuba

intentionally provided support to the FARC over a number of years and encouraged the FARC to use violence to promote its political agenda. That provision of support and encouragement facilitated the acts perpetrated against Stansell, Gonsalves, and Howes. *See* Cote Aff. ¶¶ 27–28, 32; Roig Decl. at 24. Cuba's support allowed for "[s]ophisticated communications between FARC Fronts tracking the aircraft and seeking permission to shoot it down"; the shooting down of the plane; "move[ment] of the U.S. hostages repeatedly over 5 years and . . . maint[enance] of structures in the jungle for their imprisonment and torture"; and "the necessary logistic[al] support in order to keep the hostages captive." Cote Aff. ¶ 45; *see id.* ¶¶ 29, 31, 38. Thus, Cuba is responsible, under a theory of battery, for the injuries Stansell, Gonsalves, and Howes sustained from the FARC sabotaging their aircraft and torturing them.

Cuba may be held liable under the theory of false imprisonment for the FARC's acts of hostage taking. Under general principles of tort law, a plaintiff may recover for false imprisonment when one person "(a) acts intending to confine the other . . . within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." RESTATEMENT (SECOND) OF TORTS § 35. It is indisputable that Stansell, Gonsalves, and Howes were held against their will for 1,967 days, and Plaintiffs presented sufficient evidence for this court to conclude that Cuba's provision of material support to the FARC allowed the terrorists not only to organize the act of aircraft sabotage, but also to take and hold captive the three Americans. *See* Cote Aff. ¶ 45; Roig Decl. at 24; *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 16 (D.D.C. 2007). Accordingly, the court concludes Cuba is liable to Stansell, Gonsalves, and Howes, under principles of false imprisonment, for the pain and suffering they endured as a result of the conditions of their confinement.

In addition, Stansell, Gonsalves, and Howes may recover under a theory of assault for the mental torture they endured at the hands of the FARC.  An assault occurs when one person (a) "acts intending to cause a harmful or offensive contact with the person of the other . . ., or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21.  Stansell, Gonsalves, and Howes suffered imminent apprehension of death when the FARC tortured them with mock executions and visible preparations to kill them each time a helicopter flew nearby.  Cuba may be held liable under the common law tort principles of assault for the mental harms Stansell, Gonsalves, and Howes suffered because it provided material support to the FARC's activities.  *See supra* I.B, I.D.1.

Lastly, these plaintiffs may also recover under a theory of intentional infliction of emotional distress for the emotional trauma they endured.  A defendant is liable for intentional infliction of emotional distress when he, "by extreme and outrageous conduct[,] intentionally or recklessly causes severe emotional distress to" the plaintiff.  RESTATEMENT (SECOND) OF TORTS § 46.  Terrorist acts themselves are intentional acts, aimed to cause severe emotional distress.  *See Levin*, 529 F. Supp. 2d at 17.  "Moreover, the act of engaging in terrorism by means of material support . . . is extreme, outrageous, and goes beyond all possible bounds of decency."  *Id.*  Cuba's provision of material support to the FARC, which allowed for the attack on February 13, 2003, and hostage-taking, is extreme and outrageous conduct that intentionally caused Stansell, Gonsalves, and Howes severe emotional distress.  These plaintiffs suffered extreme emotional anguish when forcibly marched through the jungle, denied medical care, refused communication with their loved ones, kept in cages, chained to trees and one another, prevented from performing basic bodily functions and needs, mock executed, and regularly being told they would be killed.

*See supra* I.B, I.D.1.  Cuba is liable for these harms as a result of directly financing, training, and otherwise providing material support to the FARC.

In sum, Cuba is liable to Stansell, Gonsalves, and Howes for the harm caused them by the FARC's acts of sabotaging their aircraft, taking and holding them hostage for 1,967 days, and physically and psychologically torturing them during their captivity.

### 2.   *The Indirect Victims—Judith Janis and the Janis Children*

Judith Janis and her four children seek damages against Cuba for their "past and future loss of solatium, mental anguish, bereavement, grief, loss of spousal [and parental] society, comfort, affections, and guidance."  *See* Compl. (closing prayer for relief).  They are American citizen-claimants who seek monetary relief for the extrajudicial killing of their husband and father, Tom Janis, at the hands of the FARC, which received material support and resources from Cuba. *See supra* III.A.  Therefore, the first, second, and fifth elements of their cause of action are satisfied.  *See* 28 U.S.C. § 1605(A)(c).  Thus, the court focuses its discussion on the elements of causation and injury.

Claims for solatium under the FSIA are nearly indistinguishable from claims for intentional infliction of emotional distress.  *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 3d 8, 22 (D.D.C. 2009).  The same framework outlined above applies, *see supra* III.C.1, and plaintiffs who are not the direct victim of the "extreme and outrageous conduct" may still recover under § 1605A(C) "if they are members of the [v]ictim's immediate family and the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present."  *Thuneibat*, 167 F. Supp. 3d at 39 (internal quotation marks omitted).

Judith, Christopher, Greer, Michael, and Jonathan have presented sufficient evidence to satisfy all the elements of a claim for intentional infliction of emotional distress. They are the widow and children of Tom Janis, and thus qualify as "members of the [v]ictim's immediate family." *See id.* Moreover, as just discussed, Cuba's provision of material support and resources to the FARC—who had previously committed acts of terrorism—was sufficiently outrageous and extreme that the Janis family members did not have to be present to suffer severe emotional harm. Their declarations make clear that each family member suffered an immense loss with the death of Tom Janis, and Cuba's support enabled the FARC to perpetrate the acts that caused their severe emotional distress.

Judith lost her husband of more than 30 years—"the love of [her] life"—and spent years after his death investigating what happened in his final moments and who murdered him. She continues to grieve daily and has no intention of remarrying. Jud. Janis Aff. ¶¶ 8, 16, 17, 19.

All four children enjoyed a close and loving relationship with their father. C. Janis Aff. ¶ 4; M. Janis Aff. ¶ 4; G. Janis Aff. ¶ 4; Jon. Janis Aff. ¶ 2. Christopher was told of his father's plane crash while deployed overseas, flew home immediately, and while in the Atlanta airport learned his father had been killed. He is saddened that he will never be able to talk to his father about their shared experiences serving in the military and feels his accomplishments are less rewarding without being able to share them with his father. C. Janis Aff. ¶¶ 10–11.

Every Father's Day, Michael Janis goes through a box of his father's belongings. Michael learned his father had been killed from misspelled headlines on CNN, and it was devastating for him to have to keep the news to himself while his mother was still traveling home from Colombia. M. Janis Aff. ¶¶ 6, 8. Tom's death has created a "darkness and emptiness" in Michael's life, and Michael blames his father's murder for his divorce. *Id.* ¶ 11. He has not yet found peace with

Tom's death, which "has been the most traumatic, painful, life-altering event [Michael] ha[s] ever experienced."  *Id.* ¶¶ 9, 12.

Following her father's death, Valentine's Day became a "dark day" for Greer, causing her to become filled with anxiety about what happened to her father on February 13, 2003, and to "relive the horror" of hearing the news that he had been killed.  G. Janis Aff. ¶ 6.  She had traveled home often to visit because of the close relationship she had with her father; Tom was "an intrinsic part of [Greer's] life" and his death "made a hole in [her] life."  *Id.* ¶ 9.

Jonathan, the youngest child, wears his father's "watch and wedding band as a daily reminder" of his loss.  Jon. Janis Aff. ¶ 7.  He is sad that he "no longer ha[s] [his] sounding board."  *Id.*  During his father's funeral, Jonathan held his mother while she wept.  *Id.* ¶ 6.  For two years, he kept his father's cell phone number programmed in his cell phone, unwilling to delete the entry.  *Id.* ¶ 7.

Thus, the members of the Janis family provided satisfactory evidence that Cuba is liable to them under § 1605A(c) for the severe emotional distress caused by the February 13, 2003, attack and extrajudicial killing of their husband and father, Tom Janis.

### D.     Damages

The purpose of § 1605A(c) is to allow victims of state-sponsored terrorism to hold liable countries that support terrorist groups for the consequences flowing from that support.  Thus, the plain text of the FSIA allows plaintiffs to pursue "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  To be awarded damages under this provision, the plaintiff "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages."  *Thuneibat*,

167 F. Supp. 3d at 47–48 (alteration adopted and internal quotation marks omitted).   Expert testimony and prior awards of damages in comparable FSIA cases inform the court's determination of what constitutes a "reasonable estimate."  *Id.* at 48.

Here, Plaintiffs have sufficiently demonstrated that Tom Janis's death, the harm caused Stansell, Gonsalves, and Howes as hostages, and the ongoing pain and suffering of the former hostages and grieving Janis family members were reasonably certain and actually intended consequences of Cuba's material support of the FARC.   Cuba knowingly encouraged, supplied, sheltered, and provided weapons and military training to these terrorists, who specifically targeted American citizens for their attacks.   Cote Aff. ¶¶ 31–33, 37–38, 41; Roig Decl. at 13–15, 16–17, 24.   In addition, Cuba utilized its close relationship with the Venezuelan government to facilitate the FARC's distribution of cocaine and safe travel along the Colombian-Venezuelan border, allowing the FARC to participate in international drug trafficking and evade efforts to thwart their operations, including recovery of the hostages.   Roig Decl. at 16–17; *see* Cote Aff. ¶ 47.   By supporting the FARC in this way, Cuba made the acts of terrorism at issue in this case and the pain and suffering they caused reasonably certain to occur.   Thus, Plaintiffs have shown that they are entitled to an award of damages.

Stansell, Gonsalves, and Howes seek compensation for their pain and suffering, while Judith and the Janis children seek solatium damages for the emotional trauma of losing their husband and father.   While quantifying these types of harms is inherently difficult, the court's "primary consideration is to ensure that individuals with similar injuries receive similar rewards." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 57, 70 (D.D.C. 2015) (internal quotation mark omitted); *accord id.* at 72.

In hostage-taking cases, this court typically relies upon a per diem calculation to award compensatory damages.  Under this framework, victims receive $10,000 for each day they were held captive and may be awarded an additional lump sum if the per diem award amount fails to account for their pain and suffering.  *See, e.g.*, *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012); *Massie v. Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008); *Levin*, 529 F. Supp. 2d at 20–21; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134–36 (D.D.C. 2005).

Stansell, Gonsalves, and Howes ask the court to follow the per diem approach and consider an additional lump sum award to account for their extreme treatment during the more than five years they were held hostage.  The court concludes that framework is appropriate.  Stansell, Gonsalves, and Howes were held captive for 1,967 days, for which the court will award each victim $19,670,000.  As in other FSIA cases, however, this base award falls short of compensating the hostage victims for the full extent of their injuries.  Stansell, Gonsalves, and Howes suffered extreme physical, mental, and emotional abuse at the hands of the FARC, made possible by Cuba's provision of material support for the FARC's activities.  The hostages survived a plane crash only to be subjected to long marches, weighed down by chains, denied medical treatment, starved, and exposed to and forced to suffer from serious illnesses—some of which are permanent.  In addition, they lived in constant fear of death, far away from home and without contact from their loved ones, and under conditions that continue to haunt them today.  This extreme suffering justifies an award greater than the per diem calculation.

Rather than submit a specific lump sum request to the court, Plaintiffs simply ask for an amount that is "fair and reasonable" under the case law.  Stansell, Gonsalves, and Howes have suffered, and will continue to suffer, life-long pain and suffering as a result of the FARC's acts.

33

The court concludes that the extent of the men's injuries warrants an additional payment of $25,000,000 each. This award aligns with lump sum awards in other cases involving extreme circumstances of hostage-taking. The amount of the award accounts for the length of time Stansell, Gonsalves, and Howes were held hostage—which far exceeds the periods of captivity of plaintiffs in other FSIA cases decided in this District—the violent shooting down of their aircraft, the extremity of their treatment in the jungle, and the ongoing physical, psychological, and emotional effects of their experience. *Cf., e.g.*, *Wyatt*, 908 F. Supp. 2d at 232 (awarding per diem amount of $210,000 for 21 days in captivity, plus $5,000,000 lump sum for pain and suffering); *Massie*, 592 F. Supp. 2d at 77 (awarding per diem amount of $3,350,000 for 335 days in captivity, plus $13,400,000 lump sum for pain and suffering); *Price*, 384 F. Supp. 2d at 134–36 (awarding per diem amount of $1,050,000 for 105 days in captivity, plus $7,500,000 lump sum for pain and suffering).

Courts also developed a framework for awarding solatium damages to spouses and immediate family members of those harmed by acts of state-sponsored terrorism. As a general matter, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse." *Flanagan*, 87 F. Supp. 3d at 117. In calculating awards for the loss of other family members, courts consider a variety of factors, including:

> (1) whether the decedent's death was sudden and unexpected;
> (2) whether the death was attributable to negligence or malice;
> (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death;
> (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death.

*Stethem v. Islamic Republic of Iran*, 89–90 (D.D.C. 2002).

The death of a spouse is undoubtedly one of the worst experiences in a person's life, only made more terrible by knowing the loved one's life ended at the hands of violent terrorists. Judith Janis had an unquestionably close relationship with her husband Tom, as evidenced by more than 30 years of marriage and a deep commitment to never spend more than 10 days apart. The pain and suffering she has experienced were magnified by the initial lack of information surrounding his death: she learned her husband had gone missing over a voicemail; only determined he had been killed days later; and worked for years with the FBI to learn exactly what happened to her husband. In light of these circumstances, the court awards Judith Janis $12,000,000 in solatium damages. *See Belkin*, 667 F. Supp. 2d at 23 (collecting cases with similar awards); *Valore*, 700 F. Supp. 2d at 85–86 (s).

The Janis children suffered a profound loss when the FARC murdered their father, the emotional effects of which remain ongoing. There is no question on this record whether Tom Janis had a close and loving relationship with each of his children. Christopher, Greer, Michael, and Jonathan each shared a special bond with their father and continue to mourn his death more than a decade later. Tom Janis's death was, indeed, sudden and unexpected—he was young, in good physical shape, and had plans to visit his youngest son, Jonathan, in Florida. The children's anguish at their father's death was only exacerbated by the lack of information available; indeed, none of the Janis children knew the full details of what happened to their father until Stansell, Gonsalves, and Howes returned more than five years later. Moreover, the court does not doubt that the manner of Tom Janis's death—successfully crash-landing a plane under fire only to be taken hostage and, some excruciating hours later, shot execution-style—adds to their pain and suffering. Particular holidays and places perpetually remind the Janis children of the loss of not only their father, but also the opportunity to share their lives with him. Their suffering has been

ongoing and will continue for the rest of their adult lives.  Thus, the court will award each of the Janis children $5,000,000 in solatium damages.

## IV.    CONCLUSION

For the reasons explained above, the court grants Plaintiffs' Motion for Default Judgment. The court enters judgment in favor of Plaintiffs and orders the Republic of Cuba to pay Keith Stansell, Marc Gonsalves, and Thomas Howes $44,670,000 each in compensatory damages; Judith Janis $12,000,000 in solatium damages; and each of the Janis children $5,000,000 in solatium damages.  A separate order accompanies this Memorandum Opinion.

Dated:  November 4, 2016

Amit P. Mehta
United States District Judge